UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

IN RE: MARK J. GINSBURG,                    CASE NO.:  10-13056-RBR

                                          CHAPTER 11

                Debtor,

_____/

MARK J. GINSBURG, Debtor-in-
Possession and                              ADV. PRO. NO.:
NATIONWIDE LABORATORY
SERVICES, INC., a Florida corporation,

                Plaintiffs,

v.

JAY L. ENIS, JACK D. BURSTEIN,
STRATEGICA CAPITAL ASSOCIATES,
INC., SWP PALM BEACH, LLC, OREN LIEBER,
RITTER ZARETSKY & LIEBER, ROYAL TITLE
& ESCROW, INC., JOSHUA GLIKMAN, SHIBOLETH,
LLP, STEVEN COOK, SCOTT KRANZ,
SUSAN ENIS, and GILDA BURSTEIN,

_____Defendants._____/

### ADVERSARY COMPLAINT

Plaintiffs, MARK J. GINSBURG, Debtor-in-Possession ("Ginsburg") and

NATIONWIDE LABORATORY SERVICES, INC. ("Nationwide") (collectively

Ginsburg and Nationwide shall be referred to as "Plaintiffs"), sue Defendants, JAY L.

ENIS ("Enis"), JACK D. BURSTEIN ("Burstein"), STRATEGICA CAPITAL

ASSOCIATES, INC. ("Strategica"), SWP PALM BEACH, LLC ("SWP"), OREN LIEBER

("Lieber"), RITTER ZARETSKY & LIEBER ("Ritter Firm"), ROYAL TITLE & ESCROW, INC. ("Royal Title"), JOSHUA GLIKMAN ("Glikman"), SHIBOLETH, LLP ("Shiboleth"), STEVEN COOK ("Cook"), SCOTT KRANZ ("Kranz"), SUSAN ENIS, and GILDA BURSTEIN (collectively "Defendants"), and allege as follows:

## JURISDICTIONAL ALLEGATIONS, VENUE AND STATUTORY AUTHORITY

1.      This adversary proceeding is brought in accordance with Rule 7001 of the Federal Rules of Bankruptcy Procedure.

2.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

3.      The venue in this district is proper pursuant to 28 U.S.C. §§ 1391, 1408 and 1409.

4.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) (A), (E) and (H).

## THE PARTIES

5.      Ginsburg is an individual who is sui juris, and a resident of Broward County, Florida, and is the Debtor-in-Possession in this Chapter 11 Bankruptcy Case pursuant to a Voluntary Petition filed under Chapter 11 of the United States Bankruptcy Code on February 9, 2010.

6.      Nationwide is a Florida corporation that maintains its principal place of business in Broward County, Florida.

7.      Upon information and belief, Enis is an individual who is sui juris, and a

resident of Miami-Dade County, Florida.

8.     Upon information and belief, Burstein is an individual who is sui juris, and a resident of Miami-Dade County, Florida.

9.     Upon information and belief, Strategica is a Florida corporation that is located in and maintains its principal place of business in Miami-Dade County, Florida.

10.     Upon information and belief, SWP is a Florida limited liability company that is located in and maintains its principal place of business in Broward County, Florida.

11.     Upon information and belief, Lieber is an individual who is sui juris, and a resident of Miami-Dade County, Florida.

12.     Upon information and belief, the Ritter Firm is a Florida professional corporation that is located in and maintains its principal place of business in Miami-Dade County, Florida.

13.     Upon information and belief, Royal Title is a Florida professional corporation affiliated with the Ritter firm that is located in and maintains its principal place of business in Miami-Dade County, Florida.

14.     Upon information and belief, Glikman is a citizen and resident of the State of New York.

15.     Upon information and belief, Shiboleth is a New York limited liability partnership that maintains its principal place of business is in the State of New York.

16.     Glikman and Shiboleth are subject to personal jurisdiction in the State of Florida as they have committed tortious acts within the State of Florida, and are engaged

in substantial and no t isolated activity with the State of Florida.

17.     Upon information and belief, Cook is an individual who is sui juris, and a resident of Miami-Dade County, Florida.

18.     Upon information and belief, Kranz is an individual who is sui juris, and a resident of Miami-Dade County, Florida.

19.     Upon information and belief, Susan Enis is an individual who is sui juris, and a resident of Miami-Dade County, Florida.   Susan Enis is the wife of Enis.

20.     Upon information and belief, Gilda Burstein is an individual who is sui juris, and a resident of Miami-Dade County, Florida.  Gilda Burstein is the wife or Burstein.

21.     All conditions precedent to the maintenance of this action by Ginsburg have occurred, or their performance has been waived by Defendants.

## GENERAL ALLEGATIONS

22.     This is an Adversary Proceeding asserting claims of fraudulent inducement, fraudulent transfer, breach of fiduciary duty, conspiracy, rescission, constructive trust, turnover of estate property,  legal malpractice, conversion, and breach of contract.

23.     Defendants, Enis and Burstein, have master-minded a scheme to defraud Ginsburg of millions of dollars and fifty (50) percent of the stock in a medical laboratory founded by Ginsburg.

24.     Enis and Burstein have utilized and received the active assistance of the other Defendants in furtherance of their schem e to defraud Ginsburg.

4

25.    Nationwide is a medical laboratory that provides medical testing services including the diagnostic testing of blood.

26.    Royco, Inc. d/b/a Nationwide was the predecessor of Nationwide.

27.    Ginsburg and Ginsburg's sister, Ricki Robinson ("Ricki") are both physicians.

28.    Ginsburg and Ricki owned Royco and then Nationwide.

### A.    The Lakes Development, the BankFirst Loan and the Undisclosed MJ Lending Mezz Loan

29.    In or around February 2006, Ginsburg was approached by Joseph Barna ("Barna") and Lee Shackelford ("Shackelford") regarding a potential real estate transaction in West Palm Beach, Florida called The Lakes at Palm Beach Condominium Residences ("The Lakes").

30.    Strategica is the managing member of SWP. Enis and Burstein formed SWP and control Strategica and SWP.

31.    SWP was to be the developer of The Lakes.

32.    In April 2005, STRATEGICA REALTY, LLC ("Strategica Realty"), another entity owned and controlled by Enis and Burstein, entered into an Agreement for Purchase and Sale with Stratford Greens, LLC for the purchase of certain real property in West Palm Beach (the "Palm Beach Property"). Upon information and belief Strategica Realty deposited $3,000,000.00 in earnest money into an escrow account held by the seller's attorney pending closing of the transaction.

33. On May 3, 2005, Strategica Realty assigned the purchase agreement to SWP.

34. Enis, through Barna and Shackleford, originally proposed a transaction to Ginsburg where The Lakes would be developed by SWP/Strategica and a group including Ginsburg and Barna.

35. Enis presented Ginsburg with numerous documents regarding The Lakes, including: plans showing that 6 apartment/condominium buildings would be built totaling 642 units; permits for the construction of the buildings; plans for the development; financial projections and budgets; renderings; price lists; a web-site for The Lakes; financial documents demonstrating the Palm Beach Property was appraised for $75,000,000, that the total interest amount on the purchase loan would be held in a restricted interest bearing account and that the loan would be paid off in three (3) years and that The Lakes would yield a 55% return on investment in three (3) years.

36. Enis represented that SWP had collected enough deposits on units to obtain a construction loan to build The Lakes. Enis further represented that it had sufficient deposits to carry the interest on the land purchase loan for three (3) years.

37. Meetings took place on several dates, including but not limited to, February 3, 2006 and February 9, 2006 regarding The Lakes.

38. Enis showed Ginsburg a written summary of the transaction that demonstrated the purchase loan would be for three (3) years; that the Palm Beach Property had an appraised value of $75,000,000; that the total interest payments would be

held in an interest bearing account; and that no cash would be taken out of The Lakes for three (3) years.

39.     Enis assured Ginsburg that although Burstein had some troubles with a bank that he ran, Enis's background was completely "clean."

40.     At the February 9, 2006 meeting, Enis again represented to Ginsburg that the Palm Beach Property had been appraised at a value in excess of $75,000,000.

41.     In late February or early March 2006, the structure of the proposed deal changed, and Strategica and SWP looked for a joint venturer to serve as a guarantor to guaranty the purchase loan for the Palm Beach Property.

42.     Originally, only Barna and Edward Weingartner were to serve as guarantors for the BankFirst Loan.  At some point, Enis, Burstein, SWP and Strategica  intended that Sidney Atzmon would also serve as a guarantor for the BankFirst Loan.

43.     In late February or early March 2006, Enis requested that Ginsburg become a joint venturer with Strategica and SWP and agree to serve as  a guarantor of the purchase loan for the Palm Beach Property.

44.     SWP's purchase price for the Palm Beach Property was $34,850,000 under an amendment to its purchase contract.

45.     Enis represented to Ginsburg that SWP's purchase of the Palm Beach Property was to be funded by a loan in the amount of approximately $36,000,000 from Marshall BankFirst ("BankFirst") (the "BankFirst Loan") and that SWP needed someone to guarantee the loan.

46.     Enis represented that the guarantor had to have at least $3,000,000 to $4,000,000 in liquid assets.

47.     In exchange for providing the guaranty, Enis and SWP promised Ginsburg that he would receive $600,000 and Ginsburg and Barna would each receive 10% of the profits from The Lakes.

48.     In the event Ginsburg and Barna were able to find an investor to buy The Lakes from SWP, they would receive 50% of the profits from the sale of The Lakes.

49.     Ginsburg met with Enis several times from February through April 2006.

50.     Enis repeated the representation that the Palm Beach Property was worth at least $75,000,000.

51.     Enis repeated the representations that Ginsburg would have no risk in the transaction, and that SWP had sufficient deposits to carry the interest on the BankFirst Loan for three (3) years.

52.     Ultimately, Enis convinced Barna and Ginsburg to serve as guarantors for the BankFirst Loan.

53.     Enis represented that Edward Weingartner, a principal of SWP and a successful developer, was also going to be a guarantor of the BankFirst Loan.

54.     On March 7, 2006, Enis sent Ginsburg an e-mail enclosing a letter on Strategica Realty's letterhead.  Enis forwarded to Ginsburg the personal financial form required by BankFirst for the guarantors of the BankFirst Loan.

55.     Enis represented to Ginsburg that:

A.    The $36,000,000 BankFirst Loan "will be eliminated as part of the construction loan";

B.    "Based on the pre-sales we believe that we'll be in the 'ground' by 8/1/06 (completed and delivered Phase I by 12/31/07)"; and

C.    Ginsburg's exposure "is covered by the $8.0m escrow" (the supposed deposits).

56.    The foregoing representations were false.  There were no pre-sales.  There was not three (3) years of interest deposited into escrow.  There were no deposits.  SWP, Enis, Burstein and Strategica had no intention to build the Lakes on the Palm Beach Property.   Instead, SWP, Enis, Burstein and Strategica intended to flip the Palm Beach Property for a profit.

57.    From March to early April 2006, Ginsburg filled out BankFirst's financial statement and worked with Enis, SWP, Strategica and BankFirst to provide the financial documentation to BankFirst.

58.    Ginsburg only agreed to allow Enis to provide his financial statement to BankFirst and never authorized Enis, SWP or Strategica to provide his financial statement or financial information to any party other than BankFirst.

59.    In connection with this, Enis was provided access to Ginsburg's financial records and learned of his ownership in Nationwide.

i.    **Lieber Represents SWP, Ginsburg and Barna**

60.    Lieber and the Ritter Firm served as counsel to SWP in connection with the

BankFirst Loan.  Lieber and Ritter also represented the guarantors, Ginsburg and Barna in connection with the loan.

61.    Lieber is Enis's son-in-law.

62.    Ginsburg asked Enis whether he needed his own attorneys in connection with the BankFirst Loan, but Enis advised Ginsburg that Lieber and the Ritter Firm would represent SWP and Ginsburg in the transaction.

63.    On numerous occasions from February through April 2006, Ginsburg asked Enis whether Enis, Burstein, Strategica (and their affiliated entities) were taking money out of the closing of the BankFirst Loan.  Enis repeatedly told Ginsburg that all the funds were needed to finance the purchase of the Palm Beach Property and that they were not taking money out of the loan.

64.    An original draft settlement statement for the transaction, which was not shown to Ginsburg, showed SWP receiving in excess of $2,700,000 in cash proceeds at the closing.  Following the objection of one of the parties to the transaction, SWP, Strategica, Enis and Burstein came up with a new way to pay themselves from the loan proceeds.

65.    Upon information and belief, Enis, Burstein and/or Strategica convinced BankFirst to violate its internal lending rules, policies and practices in extending the BankFirst Loan.

66.    BankFirst indicated that due to the change in guarantors from Atzmon to Ginsburg, it would insist on $3,000,000 being held back by the lender until such time as

Ginsburg was approved as a guarantor.

67.     Upon information and belief, SWP, Strategica, Enis and/or Burstein intended to obtain the $3,000,000 withheld by BankFirst once the loan closed without advising Ginsburg that they were receiving loan proceeds.

68.     On April 10, 2006, Lieber and the Ritter Firm sent an opinion letter to BankFirst on behalf of SWP, Ginsburg and Barna regarding the loan, and asserted that he and the Ritter Firm "have acted as counsel to" Ginsburg in connection with BankFirst Loan.

69.     Lieber is Enis's son-in-law and represented the debtor, SWP, and the guarantors, Ginsburg and Barna in the transaction. Lieber never advised Ginsburg to seek his own counsel or suggested that Ginsburg should consider retaining his own counsel. Lieber had an obligation to advise Ginsburg to seek separate counsel because his interests conflicted with SWP's.

70.     Lieber never advised Ginsburg about any potential conflict of interest, did not request that Ginsburg waive any conflict of interest, and never obtained any waiver of conflict from Ginsburg.

71.     Lieber had an inherent conflict of interest and conflict of loyalties. He represented everyone, SWP, Strategica, Enis, Burstein, Barna and Ginsburg. He had conflicting personal and professional loyalties that would have caused any reasonable lawyer to advise his clients of the conflict and to refrain from the representation.

72.     Lieber never advised Ginsburg that guaranteeing the loan subjected him to

liability for the full amount of the loan in the event of default by SWP. Lieber further never advised Ginsburg that he would be responsible for the difference between the value of the Palm Beach Property and the remaining amounts owed on the BankFirst Loan in the event of default and foreclosure.

73.     Lieber never sent the BankFirst Loan documents to Ginsburg before the closing. Ginsburg was presented the BankFirst Loan documents for the first time at the closing.

74.     Lieber, as Ginsburg's counsel, **never** verified that SWP had the three (3) year interest reserve to carry the loan; the pre-sales and deposits Enis represented existed; and never told Ginsburg that the loan was a one (1) year loan and not a three (3) year loan.

ii.     **The MJ Mezz Loan**

75.     As the terms of the BankFirst Loan developed, BankFirst insisted that approximately $4,000,000 of the $36,000,000 would be unfunded as an interest reserve on the loan. As a result of this, SWP did not have sufficient funds to close on the purchase of the Palm Beach Property and also pay themselves off.

76.     As a result, SWP took out a second loan, called a mezzanine loan, from MJ Lending Partners in the amount of $4,000,000 (the "MJ Mezz Loan").

77.     Upon information and belief, SWP, Enis, Burstein, and/or Strategica provided the personal financial statement form that Ginsburg filled out for BankFirst to MJ Lending without Ginsburg's knowledge or authorization.

78.    SWP, Enis, Burstein, and Strategica never advised Ginsburg of the MJ Mezz Loan and never explained or discussed it with him.

79.    SWP, Enis, Burstein, and Strategica never sought nor received Ginsburg's consent to disclose his financial information to MJ Lending Partners.

80.    Lieber, Ginsburg's attorney, never advised Ginsburg of the MJ Mezz Loan and never explained or discussed it with him.

81.    Notwithstanding the fact that Ginsburg was never even informed of the MJ Mezz Loan, SWP, Enis, Burstein, Strategica, and Lieber, worked together, and conspired to have Ginsburg execute a guaranty on the MJ Mezz Loan.

82.    On April 11, 2006, Lieber sent an opinion letter to MJ Lending Partners, asserting that he and the Ritter Firm "have acted as counsel to" Ginsburg in connection with the MJ Mezz Loan.

83.    The closing of the BankFirst loan took place on or about April 11, 2006. The loan was funded on April 12, 2006. At the closing of the BankFirst Loan, while papers were being circulated for execution, a guaranty for the MJ Mezz Loan was inserted among the stack of papers given to Ginsburg to sign.

84.    Shortly before the closing, Ginsburg asked Enis if the BankFirst Loan was a three (3) year loan and that SWP had sufficient funds to carry the interest on the loan for three (3) years. Enis stated that this was true. At the closing, Ginsburg asked Lieber if the BankFirst Loan was a three (3) year loan and that SWP had sufficient funds to carry the interest on the loan for three (3) years. Lieber stated that this was true.

85.     Ginsburg was not aware of the MJ Mezz Loan, and did not know he was executing a guaranty for a second loan. Lieber, who was supposedly acting as counsel for Ginsburg, did not discuss or disclose the guaranty for the MJ Mezz Loan to Ginsburg.

86.     At the closing, Ginsburg executed a guaranty for the BankFirst Loan (the "BankFirst Guaranty") and signed a document purporting to be a guaranty for the MJ Mezz Loan that was inserted into the closing papers (the "MJ Mezz Loan Guaranty").

87.     SWP, Enis, Burstein, Strategica, and Lieber knew that Ginsburg was not aware of the MJ Mezz Loan, obtained Ginsburg's signature on the MJ Mezz Loan Guaranty without his knowledge and fraudulently induced Ginsburg to sign the MJ Mezz Loan Guaranty.

88.     Prior to the closing, Enis informed Ginsburg that SWP needed additional funds from Ginsburg to close the BankFirst loan and he asked Ginsburg to pay the money. Ginsburg agreed to do so, and paid the necessary funds at closing.

89.     Weingartner did not sign a guaranty on the BankFirst Loan. No one advised Ginsburg of this. While Weingartner was at the closing, he signed loan papers on behalf of SWP but did not sign a guaranty. None of this was disclosed to Ginsburg.

90.     Upon information and belief, following the loan closing, in or around late May 2006, BankFirst paid to SWP, Strategica, Enis and/or Burstein the $3,000,000 that had been withheld by BankFirst until it approved Ginsburg as a guarantor. No one ever advised Ginsburg of this.

91.     Upon information and belief, $480,000 of this $3,000,000 was utilized to

pay a mortgage broker commission to Lee Spiegelman, who in turn, paid half of the commission to Strategica. No one ever advised Ginsburg of this.

92. In May 2006, approximately $250,000 that was held in escrow at the closing was released to SWP in addition to the $3,000,000.

## B.   Enis, Burstein, SWP, Strategica, Lieber, Royal Title and the Ritter Firm Misappropriate $2,3000,000 from Ginsburg

93. Later in 2006, Enis approached Ginsburg with another potential transaction. Enis solicited Ginsburg to provide him with $2,500,000. Enis represented to Ginsburg that Strategica was investing in 17 hotels in Miami Beach and needed funds to be placed in an escrow account as soft money and not used to fund the investments. The purpose for this "soft money" was to show to investors and lenders to demonstrate that Strategica had capital and the funding to proceed.

94. The funds were to be held in an escrow account maintained by either the Ritter Firm or the Royal Title & Escrow, Inc. ("Royal Title"), a title company owned and operated by the Ritter Firm.

95. Ginsburg was to receive 6% interest on the funds while they were held in escrow and Ginsburg was to receive a 3% interest in the Miami Beach hotel investments. The funds were to be released back to Ginsbu rg in no more than 6 months.

96. Ginsburg explained to Enis that the funds being provided were going to be used to rebuild Ginsburg's house (which had been damaged in Hurricane Wilma); could not be at risk; and could only be used as soft money such that they remained in escrow

and could not be used to fund the project. Enis agreed to this condition.

97.    Ginsburg was only able to raise $2,300,000 for the hotel project. Burstein and Enis were extremely unhappy that Ginsburg and an associate of his could not raise the full $2,500,000 and verbally berated Ginsburg's associate.

98.    Nevertheless, Enis, Burstein and Strategica accepted Ginsburg's $2,300,000 for the hotel project.

99.    The funds were deposited into an account with the Ritter Firm or Royal Title.

100.    Royal Title, Lieber and the Ritter Firm promised to provide an accounting to Ginsburg of how the funds were allocated.

101.    Royal Title, Lieber and the Ritter Firm failed to provide Ginsburg with any accounting of the funds deposited into the escrow account.

102.    In April 2007, Enis visited Ginsburg at Ginsburg's office and stated that he now needed the $2,300,000 from the escrow account for The Lakes. Enis promised Ginsburg that he would repay the $2,300,000 from the escrow account to Ginsburg with 6% interest.

103.    Unbeknownst to Ginsburg, the reason Enis needed the funds for SWP was that the BankFirst Loan was maturing on April 11, 2007.

104.    SWP's loan with BankFirst provided for an option to extend the loan for six months. SWP indicated its desire to do so. BankFirst informed Enis and SWP that to extend the loan, SWP needed to pay $1,617,099.92 to replenish the interest reserves; and

extension fee of $178,098.48; and pay an escrow deposit for real estate taxes on the Palm Beach Property in the amount of $566,675.

105.    As SWP did not have the funds required to extend the BankFirst loan, Enis, Burstein, SWP, Strategica and Lieber, conspired to defraud Ginsburg by convincing Ginsburg to fund the extension with the $2,300,000 from the Royal Title escrow account.

106.    Enis was well aware that Ginsburg needed the funds to re-build his house.

107.    Enis promised Ginsburg that the funds were not at risk and he would repay the $2,300,000 plus interest within ninety (90) days and that it was for short term use only.

108.    Ginsburg agreed to the release of his $2,300,000 solely in reliance upon Enis's representations.

109.    Enis agreed that this was a personal direct loan to Enis and that he would personally repay the $2,300,000 and accrued interest at 6% to Ginsburg.

110.    Enis never intended to repay the money to Ginsburg.

111.    On or about April 11, 2007, Emilio Lenzi ("Lenzi"), an attorney at the Ritter Firm, sent an e-mail to Ginsburg on the letterhead of Royal Title requesting that Ginsburg acknowledge that he had agreed to permit Enis to direct the Ritter Firm/Royal Title to release the $2,300,000 hotel money from its escrow account "and to use those released portions of the Deposit to pay for any debts, deposits, or otherwise of SWP Palm Beach, LLC in connection with SWP Palm Beaches, refinance of its mezzanine loan"

112.    No one explained the April 11, 2007 authorization to Ginsburg, but he

signed it in reliance on Enis's representations.

113.    Based upon the representations of Enis that he would repay the money to Ginsburg with interest, Ginsburg agreed to release the $2,300,000.

114.    Neither Lieber, Lenzi nor anyone at the Ritter Firm advised Ginsburg to obtain an agreement in writing regarding the repayment of the $2,300,000.    They provided no advice to Ginsburg on how he could protect himself and insure the repayment of the $2,3000,000.    Lieber and the Ritter Firm's failure to provide legal advice to Ginsburg occurred because they represented everyone in the transaction and possessed an irreconcilable conflict of interest.    Indeed, Lieber is Enis's son-in-law.

115.    Ginsburg was not advised to obtain his own counsel, but instead relied upon the representations of his joint venturer, Enis, and his counsel, Lieber and the Ritter Firm.

116.    On or about April 13, 2007, Lenzi confirmed to BankFirst that either the Ritter Firm or Royal Title wired $1,400,000 on behalf of SWP to BankFirst.    These were Ginsburg's funds.    Lenzi further represented that another wire of $1,357.463.49 was being wired by SWP directly to BankFirst.

117.    Upon information and belief, the balance of funds paid to BankFirst to extend the loan was paid by PDQ, Inc., a partial owner of SWP.

118.    Royal Title did not release Ginsburg's funds to refinance SWP's mezzanine loan, but instead wired the funds to BankFirst to extend the BankFirst Loan.    This did not comply with the April 11, 2007 written authorization from Ginsburg.

119.    Upon information and belief, in or around September 2008, Royal Title

released approximately $210,000 of Ginsburg's funds from the escrow account to Strategica Realty. Ginsburg did not authorize this release of funds.

120.    Royal Title failed to pay Ginsburg any interest on the escrowed $2,300,000. Upon information and belief, Royal Title paid any interest earned on the $2,300.000 to Strategica or Strategica Realty without Ginsburg's authorization.

### C.    The Beher Mezz Loan

121.    The MJ Mezz Loan was also a one (1) year loan that matured and went into default in early April 2007.

122.    Around the same time that the BankFirst Loan was extended, Enis, Burstein, SWP and Strategica also paid off the MJ Mezz Loan by obtaining a second mezzanine loan from Beher Holdings Ltd. ("Beher") in the amount of $4,400,000.

123.    Originally, the second lender was to be the Edwards Family Partnership, LLP, but ultimately an associated entity, Beher became the second mezzanine lender.

124.    Once again, Enis, Burstein, SWP and Strategica wanted Ginsburg to serve as the guarantor for the Beher Mezz Loan. They again used Lieber as the lawyer to accomplish this by representing everyone in the loan because he was Enis's son-in-law, had a conflict of interest, and would do their bidding rather than provide legal advice to Ginsburg.

125.    Without Ginsburg's consent, knowledge or approval, Enis, Burstein, SWP and/or Strategica provided Beher with Ginsburg's personal financial statement from March 2007. Ginsburg only authorized its release to BankFirst.

126.    Enis, Burstein, SWP and Strategica did not disclose, explain or discuss the Beher Mezz Loan with Ginsburg.

127.    Enis told Ginsburg that Lieber was going to forward him papers to sign for the BankFirst Loan.

128.    Lieber did not disclose or explain the Beher Mezz Loan to Ginsburg.

129.    Lieber failed to provide adequate legal advice or services to Ginsburg. Rather than explaining the Beher Mezz Loan to Ginsburg, explaining Ginsburg's potential liability to him, or providing any legal advice to Ginsburg, Lieber instead went about to just obtain Ginsburg's signatures to the Beher Mezz Loan documents as he was directed to by Enis, Burstein, SWP and Strategica.

130.    Lieber sent signature pages for the Beher Mezz Loan to Ginsburg and instructed him to sign them with no explanation that Ginsburg was guaranteeing an entirely new loan. Ginsburg thought that the signature pages were part of the BankFirst Loan. Ginsburg followed Lieber's instructions and signed the signature pages.

131.    The closing date was April 27, 2007. SWP and BankFirst executed an amendment to the loan replacing the subordinate lender MJ Lending Partners with the new subordinate lender Beher. Susan Enis is one of the signatories to the extension.

132.    Additionally, BankFirst sent an Acknowledgement of Extension Option to SWP, Barna and Ginsburg, it was signed by Burstein on behalf of SWP.

133.    Upon information and belief, Barna refused to sign the BankFirst Loan extension and Beher Mezz Loan documents.

134.   Upon information and belief, Strategica, SWP, Enis or Burstein forged Barna's signatures on the BankFirst Loan extension and Beher Mezz Loan documents.

135.   SWP utilized the Beher Mezz Loan to pay off the MJ Lending Mezz Loan.

136.   In connection with the Beher Mezz Loan, Ginsburg signed a signature page to a document that apparently was a guaranty of the Beher Mezz Loan.

**D.   SWP Defaults On the BankFirst Loan and the Beher Mezz Loan**

137.   The BankFirst loan came due in October 2007.

138.   SWP, Strategica, Enis and Burstein did not develop The Lakes and failed to make the required payments under the BankFirst loan. SWP did not have the deposits, the pre-sales or the three (3) year interest reserve that Enis represented to Ginsburg existed.

139.   Enis represented to BankFirst that he had potential deals lined up to change The Lakes from a condominium transaction to a senior living and skilled nursing facility.

140.   Enis attempted to string BankFirst along with false promises regarding potential deals.

141.   On December 10, 2007, BankFirst declared the entire amount of indebtedness due and demanded payment in full of $38,751.547.61.

142.   Subsequently, BankFirst and SWP and Enis negotiated a Forbearance Agreement whereby BankFirst would forbear legal action while SWP was making interest payments.

143.   On or about January 31, 2008, BankFirst again informed SWP of its default

and provided a February 11, 2008 cure date.

144.    On February 26, 2008, BankFirst informed Beher of the default and demanded payment of the $370,000 escrowed under the Default Contingency and Escrow Agreement.

145.    On or about March 10, 2008, BankFirst filed a lawsuit in Palm Beach County against SWP and Ginsburg among others to foreclose the Palm Beach Property, and collect on the BankFirst Loan and BankFirst Guaranty.

146.    On or about April 15, 2009, BankFirst was awarded summary judgment. On or about May 21, 2009, BankFirst bought the Palm Beach Property at a foreclosure sale.    BankFirst is seeking a deficiency judgment from Ginsburg in excess of $25,000,000.

147.    On or about, December 21, 2007, Beher declared SWP in default under the Beher Mezz Loan and demanded payment of the entire principal of the Beher Mezz Loan and interest.

148.    On or about November 20, 2008, Beher filed a lawsuit in Miami-Dade County against Ginsburg and Barna to collect on the guaranties of the Beher Mezz Loan.

149.    Beher did not file suit against SWP or its principals.

150.    From the onset of the BankFirst Loan lawsuit, Enis falsely represented to Ginsburg that Ginsburg did not have to worry about the litigation because Enis was working on a deal with BankFirst and a prospective purchaser to cure the default.

151.    From the onset of the Beher Mezz Loan lawsuit, Enis falsely represented to

22

Ginsburg that Ginsburg did not have to worry about the litigation because Enis was working on a deal and a prospective purchaser to cure the default of the Beher Mezz Loan.

152.    Enis recommended the attorneys to represent Ginsburg in the lawsuits, and convinced the attorneys that a deal and resolution of the matter were forthcoming and that they and Ginsburg did not need to address or worry about the lawsuits.

153.    Ginsburg relied upon Enis's representations that he had secured a deal and resolution of the litigation over the loans and that he did not have to worry about the litigation.

**E.    Defendants Defraud Ginsburg Into Giving Up Half of Nationwide**

154.    In connection with the BankFirst loan, Enis, Burstein and Strategica had access to Ginsburg's financial information.  Such information was provided to Enis, Burstein and Strategica so that they could transmit it to BankFirst to demonstrate that Ginsburg had at least $3,000,000 in liquidity.

155.    Having already convinced Ginsburg to guaranty the BankFirst Loan (without providing any benefit to Ginsburg), Defendants next proceeded to defraud Ginsburg out of half of his (and his sister's) interest in Nationwide.

156.    In May 2006, Enis proposed to Ginsburg that Strategica and Nationwide enter into a joint venture.  Enis proposed that Strategica would initially generate $4,000,000 in value to Nationwide.

157.    Enis proposed that Strategica would provide financial advisory services and

skills to Nationwide thereafter to generate approximately $40,000,000 in value to Nationwide.

158.    The $4,000,000 that Strategica was to raise initially for Nationwide was to be utilized to pay-off a settlement agreement that had been entered by Nationwide and Ginsburg with a third party, Bernard Pachter (the "Original Pachter Agreement").

159.    As part of its obligations, and as a material inducement for entering the Consulting Agreement and Shareholders Agreement and as consideration for the Consulting Agreement and the Shareholders Agreement, Strategica was required to fund the buyout of the Pachter Agreement[1] entered into by Ginsburg and Nationwide. A true and correct copy of the Satisfaction and Discharge of Confidential Settlement Agreement by and between Ginsburg, Nationwide, Strategica and Bernard D. Pachter is attached hereto as Exhibit "A" ( the "Satisfaction Agreement").    Specifically, under the Satisfaction Agreement, Strategica was required to pay $4,000,000 so that the settlement agreement could be satisfied and discharged.    In addition, the obligation to fund the buyout was also a dependent covenant of the entire relationship and agreement between Strategica and Nationwide.

160.    Strategica, Enis and Burstein's promise to provide money to Nationwide formed the basis of the entire relationship between Strategica and Nationwide.

161.    Enis proposed that Strategica would receive 1% in equity in Nationwide for each $1,000,000 of value created, capped at 40% for $40,000,000.

---

[1] The terms of the Original Pachter Agreement were confidential.

162.    Enis further proposed that after "funding originated by Strategica," Strategica would be paid $10,000 per month for as long as Strategica was a shareholder of Nationwide. Enis provided additional fees would be paid based on a percentage of gross amount of any transaction.

163.    In connection with the proposed transaction, Strategica, Enis, Burstein, Ginsburg and Nationwide retained Glikman, a lawyer at Shiboleth, to represent them in the transaction.

164.    Glikman and Shiboleth had a previous relationship with and served as counsel to Strategica, Enis and Burstein.

165.    Strategica, Enis, Burstein recommended that the parties retain Glikman and Shiboleth to represent everyone in the transaction as part of their "scheme" to acquire ownership of half of Nationwide and lucrative monetary compensation from Nationwide.

166.    The "scheme" involved having Ginsburg and Nationwide execute documents (described in greater detail below) giving Enis, Burstein, Strategica and their designees ownership and control over half of Nationwide and paying Strategica substantial sums monthly without requiring Strategica, Enis or Burstein to provide anything of value to Ginsburg or Nationwide.

167.    As part of their "scheme", Strategica, Enis, Burstein would use Glikman in New York, to serve at the attorney for all parties and to protect Strategica, Enis's and Burstein's interests by drafting provisions intended to protect them.

168.    As part of the "scheme", Glikman would not draft provisions to protect

Ginsburg or Nationwide.

169.    Glikman agreed to represent all parties in the transaction despite the existence of an unwaivable conflict of interest.

170.    Glikman did not fulfill his legal and ethical duties to Ginsburg and Nationwide, including but not limited to, failing to render any advice how to provide legal protection to Ginsburg's interests.

171.    Glikman, Burstein and Enis represented to Ginsburg that he did not need to retain his own attorney.

172.    Based upon the representations of Glikman, Enis and Burstein, Ginsburg and Nationwide did not retain separate counsel in the transaction.

173.    Glikman, Enis and Burstein knew that Ginsburg and Nationwide did not retain separate counsel in the transaction.

174.    Glikman followed the instructions of Enis and Burstein to the detriment of Ginsburg and Nationwide, and favored the interests of Enis, Burstein and Strategica over the interests of Ginsburg and Nationwide.

175.    Glikman is licensed to practice law in the State of New York.

176.    Glikman represented to Ginsburg that he was licensed to practice law in the both New York and Florida.   That representation was false as Glikman is not licensed to practice law in the State of Florida.

177.    All of the parties that Glikman represented in the transaction are Florida residents; Nationwide and Strategica are Florida businesses; and the transaction was a

Florida transaction.

178.    Negotiations continued between Ginsburg and Strategica/Enis/Burstein from May through September 2006.

179.    Glikman prepared draft Stock Purchase Agreements, a draft Shareholders Agreement, and memoranda to the parties in June 2006. Among the provisions of the June 2006 draft Shareholders Agreement was a clause purporting to waive any conflict of interest in Glikman and Shiboleth's representation of all parties in the transaction.

180.    Notwithstanding the fact that the parties were still negotiating the terms of the transaction, Glikman represented that he could represent all parties in the transaction and that any conflict of interest that may have existed could be waived by the parties.

181.    On September 25, 2006, Glikman sent Ginsburg a letter that purported to be a waiver of the conflict of interest arising from Glikman and Shiboleth's representation of all parties in the transaction.  Glikman also included waiver of conflict provisions in the agreements he drafted.  Glikman had already been representing all of the parties in the transaction before he requested a waiver of the conflict of interest from Ginsburg and Nationwide.

182.    Glikman did so for his own benefit and protection.  Glikman was acting in his own interests and in the interests of Strategica, Enis and Burstein and not for the interests of Ginsburg or Nationwide.

183.    Under the professional rules of ethics applicable to this transaction, Glikman and Shiboleth were required to advise Ginsburg and Nationwide, that they could

not, under any circumstance, represent all parties to the transaction and advise Ginsburg and Nationwide to retain separate counsel.

184.    Instead of doing so, as part of the "scheme", Glikman and Shiboleth agreed to and did represent all parties in the transaction to the detriment of Ginsburg and Nationwide.

185.    On or about September 26, 2006, Nationwide and Strategica executed a Financial Advisory and Business Consulting Agreement (the "Consulting Agreement") (a true and correct copy is attached as Exhibit "B").    The Consulting Agreement was prepared by Glikman.

186.    Enis, Burstein and Strategica's "scheme" to take 50% control of Nationwide from Ginsburg and receive substantial compensation from Nationwide without having to provide any value to Nationwide was a multi-faceted "scheme."  The Consulting Agreement was one of the steps in the "scheme."

187.    The Consulting Agreement set forth a term of 10 years, renewable annually. (Ex. B § 1).    There is no termination provision during the 10 year term of the Consulting Agreement.

188.    Section 2 of the Consulting Agreement set forth a generic description of the services to be provided by Strategica.    Notably, it further provides that the "manner in which Consultant renders the Consulting Services to the Company under this Agreement shall be within [Strategica's] sole control and discretion . . ." The Consulting Agreement did not actually require Strategica to do anything.

189.   In exchange for the illusory, vague and empty agreement to provide consulting services in its sole control and discretion, Strategica was to be paid $60,000 per month from Nationwide. (Ex. B § 4(a)).

190.   The Consulting Agreement further provided that 50% of the outstanding shares of Nationwide would be issued to Strategica and/or its designees. The document stated that the fair market value of the stock to be issued to Strategica (and/or its designees) at $250,000. (Ex. B, §§ 4(c), 5(a)).

191.   Paragraph 5(b) of the Consulting Agreement stated that Strategica, its designees, Ginsburg and his sister Ricki, would enter into a shareholders agreement.

192.   Section 14 of the Agreement purports to be a conflict waiver provision, waiving the conflict of interest arising from Glikman and Shiboleth's representation of all parties to the transaction. (Ex. B, § 14).

193.   Somehow, from May 2006, when Strategica's compensation would be based on actual money raised for Nationwide, under the Consulting Agreement, Strategica was to be paid substantial amounts by Nationwide without any concomitant obligation to do anything.

194.   Strategica was supposed to provide $4,000,000 to Nationwide to pay off the Original Pachter Agreement, bring "intellectual capital" to Nationwide, inject approximately $40,000,000 in value to Nationwide, and provide advice for growing Nationwide's business.

195.   From September 2006 through 2007, Glikman and Strategica engaged in

significant due diligence regarding Nationwide.

196.    Glikman did not advise Ginsburg and Nationwide to do any due diligence on Strategica or its principals Enis and Burstein.

197.    Glikman made several trips to Florida in connection with his representation of Ginsburg and Nationwide, held meetings in Florida and performed legal services while in Florida.

198.    The second facet of Defendants' fraudulent "scheme" is embodied in the Shareholders Agreement dated as of January 31, 2007 (but actually executed much later in 2007) (the "Shareholders Agreement") (a true and correct copy is attached as Exhibit "C").

199.    Glikman prepared the Shareholders Agreement.

200.    Under the terms of the Shareholders Agreement, Strategica, through nominees, was to be issued 50% of the shares of Nationwide.

201.    The signatories to the Shareholders Agreement are Nationwide, Ginsburg, Robinson, Gilda Burstein, Susan Enis, Cook, and Kranz.

202.    Gilda Burstein, Susan Enis, Cook, and Kranz are straw persons/designees for Strategica, Enis and Burstein.

203.    Gilda Burstein, Susan Enis, Cook, and Kranz agreed with Strategica, Enis and Burstein to participate in the "scheme" to defraud Ginsburg and Nationwide.

204.    Gilda Burstein, Susan Enis, Cook, and Kranz executed the Shareholders Agreement to advance Defendants' conspiracy.

205.   Enis and Burstein chose to put the stock in their wives' names to shield their assets.  Part of Enis and Burstein's modus operandi is to put very little in their own names as part of their fraudulent schemes.

206.   Under the Shareholders Agreement, Enis, Burstein and their straw persons/designees obtained 50% of Nationwide from Ginsburg and Robinson, put themselves on Nationwide's board of directors and made themselves officers of Nationwide even though Strategica, Enis and Burstein put no money into Nationwide and brought no money to Nationwide.

207.   Ginsburg and Nationwide made several pages of representations and warranties in the Shareholders Agreement. (Ex. C § 14), while no representations or warranties are made by Strategica, Enis, Burstein or their straw persons/designees Gilda Burstein, Susan Enis, Cook, and Kranz to Ginsburg, Ricki or Nationwide.

208.   Glikman did not advise Ginsburg and Nationwide to obtain any representations or warranties from Strategica, Enis, Burstein or their straw persons/designees, Gilda Burstein, Susan Enis, Cook, and Kranz.

209.   Glikman had an irreconcilable and unwaivable conflict of interest.  Just as Enis, Burstein and Strategica used Lieber as part of their "scheme", here, they used Glikman to advance their own interests.

210.   Glikman specifically drafted Section 14 of the Shareholders Agreement to benefit one set of clients, his friends and cronies, Strategica, Enis, Burstein and their straw persons/ designees, Gilda Burstein, Susan Enis, Cook, and Kranz, over the interests

of his other clients, Ginsburg and Nationwide.

211.    No value or payment to Ginsburg, Ricki or Nationwide was made for the issuance of 50% of the stock of Nationwide to Gilda Burstein, Susan Enis, Cook, and Kranz.

212.    Nationwide, Ginsburg and Ricki executed the Shareholders Agreement on or about June 2007.

213.    Upon information and belief, Gilda Burstein, Susan Enis, Cook, and Kranz executed the Shareholders Agreement on or about May 2007.

214.    Shares of stock in Nationwide were issued to Gilda Burstein, Susan Enis, Cook, and Kranz.

215.    Strategica, Burstein and Enis have failed to raise any capital for Nationwide.

216.    Strategica failed to pay the $4,000,000 required under the Satisfaction and Discharge of Confidential Settlement Agreement (Exhibit A).

217.    Instead, Nationwide had to borrow the funds and incur additional debt.

218.    Notwithstanding this, Strategica, Enis and Burstein purported to collect on the original Note and UCC Financing Statement from the original settlement agreement claiming that Nationwide owed the debt to Strategica.  This was yet another "scheme" of Strategica, Enis and Burstein.

219.    Strategica failed to provide consulting services to Nationwide as required in the Consulting Agreement.

32

220.    Strategica, Burstein and Enis also presented numerous proposals for Nationwide that violated various federal and state laws, and would have endangered Ginsburg's medical license and Nationwide's ability to continue.

221.    Strategica, Enis and Burstein proposed providing deep discounts to customers in the attempt to obtain referrals. This violates federal and state anti-kickback laws. See e.g. 42 U.S.C. § 1320a-7(b).

222.    Other illegal business suggestions by Strategica, Enis and Burstein to Nationwide include but are not limited to the following:

A.    recommending flat fee billing for skilled nursing facilities ("SNFs");

B.    paying for laboratory staff in facilities even though the labs were owned by SNFs;

C.    giving equipment to SNFs so they could receive reimbursement for tests leading to double billing;

D.    teaching physicians working at SNFs how to order more tests, and otherwise encouraging SNFs to increase the volume and revenue from SNFs;

E.    providing automatic discounts on current lab bills to SNFs, that would encourage them to switch to Nationwide for lab work with the goal of ultimately obtaining management fees from the SNFs;

F.    basing management fees from physician office laboratories ("POL") on collections rather than billings;

G.    reducing management fees and/or agreeing that non-POL blood work would

be sent to Nationwide;

       H.     leasing real estate in buildings to try to have a presence with POLs;

       I.     stating that doctors could receive referral fees for ordering a subscription to the sleep program even if they did not complete a medical review/reading of the results;

       J.     paying physicians to come to dinner to serve as consultants;

       K.     utilizing sales representatives from different businesses for sleep program to evade restrictions on providing benefits; and

       L.     suggesting that Nationwide provide chart reviews for SNFs.

       223.     Strategica, Enis and Burstein sought to implement these suggestions as part of Nationwide's business, and Ginsburg and Nationwide's compliance staff were forced to prevent these violations of applicable laws and regulations.

       224.     In March-April 2009, the relationship between Ginsburg and Enis, Burstein and Strategica deteriorated.  At this point, Ginsburg and Nationwide learned that the Consulting Agreement and Shareholders Agreement were drafted to favor Strategica, Enis, Burstein and their straw-persons-designees, and provided no protection to Ginsburg and Nationwide

       225.     Strategica, Enis and Burstein have previously engaged in schemes and plans similar to the one perpetrated in this case.

       226.     Enis, for example, engaged in behavior which had as its goal the diversion of customers to his business.  In fact, a judgment was entered against Enis for such conduct in favor of Nike, Inc. and Adidas-Salomon A.G. and related entities, in the amount of

$17,000,000 plus $95,865.33 in fees and $31,800.05 in expenses on October 6, 2006 in the United States District Court for the Southern District of New York for willfully selling counterfeit goods.

227.     In addition, Enis and Burstein were also engaged in a business scheme through Strategica Import-Export Financial Group, LLC (another company owned and controlled by Enis and Burstein), in breach of the fiduciary duties or state law. Upon information and belief, Strategica Import-Export Financial Group, LLC and Enis were criminally charged in Alaska in 2007 with violating Alaska's Food, Drug and Cosmetic Act for letting 400 tons of salmon spoil in what prosecutors called "an environmental and economic catastrophe." Upon further information and belief, while charges against Enis were dismissed as part of a plea deal, Strategica Import-Export Financial Group, LLC pled guilty and was sentenced to a substantial fine.

228.     These aforementioned circumstances show motive, intent and plans in breach of business obligations and law for the purpose of enriching themselves in a manner comparable to that described in this complaint.

**F.     Strategica, Enis and Burstein Steal Business from Nationwide and Utilize Nationwide's Proprietary and Confidential Information**

229.     Strategica and its principals, Enis and Burstein, agreed to maintain and treat as strictly confidential Nationwide's proprietary and confidential information.  (Ex. B, § 7).

230.     Strategica   is   prohibited   from   using   Nationwide's   proprietary   and

confidential information "for any purpose whatsoever, other than in connection with the ordinary course of providing the Consulting Services." (Ex. B, § 7(b)).

231.    Strategica and its principals, Enis and Burstein, further agreed not to engage as a stockholder, member, partner, officer, lender, consultant or agent in any other business involving medical laboratory facilities furnishing medical testing services, or to solicit any officer or employee of Nationwide. (Ex. B, § 8).

232.    Strategica, Enis and Burstein violated § 7 of the Consulting Agreement by utilizing Nationwide's confidential and proprietary information for their own business purposes apart from Nationwide.

233.    Strategica, Enis and Burstein also violated § 8 of the Consulting Agreement, by setting up businesses that competed with Nationwide, and directing customers/clients and samples to their competing business for testing.

234.    Strategica, Enis and Burstein created Doctors Choice Ancillary Services and a number of other entities to compete with Nationwide.  Moreover, Strategica, Enis and Burstein have diverted business from Nationwide to their Home Healthcare Agency; have entered into business arrangements with phlebotomists such as Connell Phlebotomy, LLC without advising Ginsburg or Nationwide; and have poached customers of Nationwide.

## COUNT I – FRAUD IN THE INDUCEMENT - GINSBURG v. STRATEGICA, SWP, ENIS, BURSTEIN (BANKFIRST LOAN GUARANTY, MJ MEZZ LOAN GUARANTY)

235.    Ginsburg repeats and realleges each and every allegation contained in

Paragraphs 1 through 234 above as if set forth herein in full.

236.    This is an action for damages sustained by Ginsburg substantially in excess of $75,000.00 as a result of fraud in the inducement committed by Strategica, SWP, Enis and Burstein.

237.    In February through April 2006, Strategica, SWP, Enis and Burstein, and their agents and representatives made various and numerous misrepresentations and false statements to Ginsburg to induce him to execute the guaranties for the BankFirst Loan and the MJ Lending Mezz Loan.

238.    Specifically, Strategica, SWP, Enis and Burstein, in concert with each other, made the following false and fraudulent misrepresentations:

A.    that Strategica/SWP had sufficient deposits to carry the interest on the BankFirst loan for three (3) years;

B.    that the $36,000,000 loan "will be eliminated as part of the construction loan."

C.    that "[b]ased on the pre-sales we believe that we'll be in the 'ground' by 8/1/06 (completed and delivered Phase I by 12/31/07)";

D.    that Ginsburg's exposure "is covered by the $8.0m escrow";

E.    that Enis, Burstein, Strategica, SWP (and their affiliates) were not taking money out from the loan closing;

F.    that Weingartner was going to guaranty the BankFirst Loan;

G.    that Ginsburg would receive $600,000;

H.     that the Palm Beach Property was worth at least $75,000,000; and

I.     that the term of the BankFirst Loan was a three (3) year loan.

239.   Strategica, SWP, Enis and Burstein also committed a material fraudulent omission by failing to inform Ginsburg of the MJ Lending Mezz Loan. They intentionally deceived Ginsburg into signing the MJ Lending Mezz Loan by inserting it into the closing papers to be signed without ever informing Ginsburg of its existence.

240.   These representations and omissions were false.

241.   Strategica, SWP, Enis and Burstein made the aforesaid misrepresentations and/or omissions, knowingly and willfully, and fully intending that Ginsburg rely upon the same.

242.   At the time of their representations and/or omissions, Strategica, SWP, Enis and Burstein knew or should have known that the same were false and/or that they were failing to disclose material facts.

243.   At the time of their representations, Strategica, SWP, Enis and Burstein also knew or should have known that they were not capable of performing as represented, and had no intention of performing as represented.

244.   Ginsburg executed the BankFirst Loan Guaranty, and a document purporting to be the signature page of the MJ Mezz Loan Guaranty in justifiable reliance upon Strategica, SWP, Enis and Burstein's fraudulent misrepresentations and/or omissions as aforesaid.

245.   As a direct and proximate result of the aforesaid fraudulent conduct,

Ginsburg has suffered damages substantially in excess of $75,000.00.

246.    Defendants, Strategica, SWP, Enis and Burstein acted maliciously and engaged in intentional misconduct and had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to Ginsburg would result and intentionally pursued that conduct resulting in injury to Ginsburg.

WHEREFORE, Plaintiff, Ginsburg, hereby demands judgment against the Defendants, Strategica, SWP, Enis and Burstein, for compensatory damages substantially in excess of $75,000.00, punitive damages of at least $10,000,000 or more, together with awarding Ginsburg his costs and disbursements, pre-judgment interest, and such other and further relief as this Court deems just, equitable and proper.

## COUNT II – FRAUD IN THE INDUCEMENT - GINSBURG v. STRATEGICA, SWP, ENIS, BURSTEIN (BANKFIRST EXTENSION, BEHER MEZZ LOAN GUARANTY)

247.    Ginsburg repeats and realleges each and every allegation contained in Paragraphs 1 through 234 above as if set forth herein in full.

248.    This is an action for damages sustained by Ginsburg substantially in excess of $75,000.00 as a result of fraud in the inducement committed by Strategica, SWP, Enis and Burstein.

249.    In April 2007, Strategica, SWP, Enis and Burstein, and their agents and representatives made various and numerous misrepresentations and false statements to Ginsburg to induce him to execute the consent to continue guaranteeing the BankFirst loan when it was extended, to release the $2,300,000, plus interest, held in the Royal Title

escrow account, and to sign the guaranty for the Beher Mezz Loan.

250.    Specifically, Strategica, SWP, Enis and Burstein, in concert with each other, repeated the following false and fraudulent misrepresentations:

A.    that Strategica/SWP had sufficient deposits to carry the interest on the BankFirst loan for three (3) years;

B.    that the $36,000,000 loan "will be eliminated as part of the construction loan"; and

C.    that Ginsburg's exposure "is covered by the $8.0m escrow."

251.    Strategica, SWP, Enis and Burstein, in concert with each other, also made the following new false and fraudulent misrepresentations:

A.    that Enis was going to find a buyer to purchase The Lakes and pay off the BankFirst Loan;

B.    that Enis was going to repay the $2,300,000 plus interest to Ginsburg; and

C.    that Barna had agreed to the extension of the BankFirst Loan.

252.    Strategica, SWP, Enis and Burstein, in concert with each other, committed material fraudulent omissions by failing to inform Ginsburg:

A.    that the BankFirst Loan had a one year term, had matured, and that they needed the funds to cover the interest on the extended loan; and

B.    that the Beher Mezz Loan was being taken out to pay off the MJ Mezz Loan. They did not disclose, explain or discuss the Beher Mezz Loan with Ginsburg.

253.    Upon information and belief, Strategica, SWP, Enis or Burstein, forged or

caused Barna's signature to be forged on the BankFirst Loan extension and the Beher Mezz Loan Guaranty.

254.    These representations and omissions were false.

255.    Strategica, SWP, Enis and Burstein made the aforesaid misrepresentations and/or omissions, knowingly and willfully, and fully intending that Ginsburg rely upon the same.

256.    At the time of their representations, Strategica, SWP, Enis and Burstein knew or should have known that the same were false and/or that they were failing to disclose material facts.

257.    At the time of their representations and/or omissions, Strategica, SWP, Enis and Burstein also knew or should have known that they were not capable of performing as represented, and had no intention of performing as represented.

258.    Ginsburg executed the BankFirst extension and signed a document purporting to be the signature page of the guaranty of the Beher Mezz Loan in justifiable reliance upon Strategica, SWP, Enis and Burstein's fraudulent misrepresentations and/or omissions as aforesaid.

259.    As a direct and proximate result of the aforesaid fraudulent conduct, Ginsburg has suffered damages substantially in excess of $75,000.00.

260.    Defendants, Strategica, SWP, Enis and Burstein acted maliciously and engaged in intentional misconduct and had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to Ginsburg would result and

41

intentionally pursued that conduct resulting in injury to Ginsburg.

WHEREFORE, Plaintiff, Ginsburg, hereby demands judgment against the Defendants, Strategica, SWP, Enis and Burstein, for compensatory damages substantially in excess of $75,000.00, punitive damages of at least $10,000,000 or more, together with awarding Ginsburg his costs and disbursements, pre-judgment interest, and such other and further relief as this Court deems just, equitable and proper.

## COUNT III – BREACH OF FIDUCIARY DUTY – GINSBURG v. STRATEGICA, SWP, ENIS, BURSTEIN

261.   Ginsburg repeats and realleges each and every allegation contained in Paragraphs 1 through 234 above as if set forth herein in full.

262.   This is an action for damages sustained by Ginsburg substantially in excess of $75,000.00 as a result of breaches of fiduciary duty committed by Strategica, SWP, Enis and Burstein.

263.   Ginsburg entered into a joint venture with Strategica, SWP, Enis, Burstein and Barna to develop The Lakes on the Palm Beach Property.

264.   Ginsburg, Strategica, SWP, Enis, Burstein and Barna shared a joint community of interest to develop The Lakes on the Palm Beach Property.

265.   Strategica, SWP, Enis, and Burstein promised Ginsburg a share in the profits of The Lakes on the Palm Beach Property by promising Ginsburg and Barna each 10% of the profits for guaranteeing the BankFirst Loan and providing the funds needed to close the BankFirst Loan.

266.    By guaranteeing the BankFirst Loan, Ginsburg necessarily would share in any losses in the venture.

267.    Ginsburg shared a joint proprietary interest and right of control in the subject matter of the joint venture with Strategica, SWP, Enis, and Burstein.

268.    As joint venturers with Ginsburg, Strategica, SWP, Enis, and Burstein owed and owe Ginsburg a fiduciary duty to act with the utmost good faith, honesty, and loyalty.

269.    Strategica, SWP, Enis, and Burstein owed and owe Ginsburg a fiduciary duty to fully and honestly disclose all matters which may affect their common interests.

270.    Defendants, Strategica, SWP, Enis, and Burstein have breached their fiduciary duties to Ginsburg in the following material respects, inter alia:

A.    Falsely representing that:

(i) Strategica/SWP had sufficient deposits to carry the interest on the BankFirst Loan for three (3) years;

(ii) the $36,000,000 loan "will be eliminated as part of the construction loan;"

(iii) "[b]ased on the pre-sales we believe that we'll be in the 'ground' by 8/1/96 (completed and delivered Phase I by 12/31/07)";

(iv) Ginsburg's exposure "is covered by the $8.0m escrow";

(v) Enis, Burstein, Strategica, SWP (and their affiliates) were not taking money out from the loan closing;

(vi)    that Weingartner was going to guaranty the BankFirst Loan;

    (vii)   that Ginsburg would receive $600,000; and

    (viii)   that the term of the BankFirst Loan was a three (3) year loan;

B.    Failing to disclose or explain the MJ Mezz Loan to Ginsburg;

C.    Utilizing an inflated appraisal of the Palm Beach Property to borrow far more than it was worth, and so as to avoid having to use any of their own funds in connection with The Lakes;

D.    Making false representations to Ginsburg regarding a potential sale of the Palm Beach Property which would pay off the loan;

E.    Failing to disclose or explain the Beher Mezz Loan to Ginsburg;

F.    Failing to repay money owed to Ginsburg; and

G.    Convincing Ginsburg to allow the $2,300,000 to be released.

271.    Based on the foregoing, Defendants, Strategica, SWP, Enis, and Burstein, have breached their fiduciary duties owed to Ginsburg.

272.    As a result and proximate result of Defendants', Strategica, SWP, Enis, and Burstein, breaches of fiduciary duty as aforesaid, Ginsburg has sustained damages substantially in excess of $75,000.00.

273.    Defendants, Strategica, SWP, Enis and Burstein acted maliciously and engaged in intentional misconduct and had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to Ginsburg would result and intentionally pursued that conduct resulting in injury to Ginsburg.

WHEREFORE, Plaintiff, Ginsburg, hereby demands judgment against the

Defendants, Strategica, SWP, Enis and Burstein, for compensatory damages substantially in excess of $75,000.00, punitive damages of at least $10,000,000 or more, together with awarding Ginsburg his costs and disbursements, pre-judgment interest, and such other and further relief as this Court deems just, equitable and proper.

### COUNT IV –CONSPIRACY  - GINSBURG v. ALL DEFENDANTS

274.    Ginsburg repeats and realleges each and every allegation contained in Paragraphs 1 through 234 above as if set forth herein in full.

275.    This is an action for damages sustained by Ginsburg  substantially in excess of $75,000.00 on account of the Defendants' conspiracy

276.    The Defendants agreed and conspired to defraud Ginsburg and Nationwide, and breach fiduciary duties owed to Ginsburg and Nationwide.

277.    Strategica, Burstein, Enis and SWP breached their fiduciary duties to Ginsburg, and made numerous misrepresentations of fact to Ginsburg.

278.    Burstein and Enis breached their fiduciary duties to Nationwide.

279.    Strategica, Enis and Burstein committed fraud on Nationwide and Ginsburg.

280.    Lieber and Glikman intentionally violated their professional obligations and fiduciary duties to Ginsburg.

281.    Royal Title violated its obligations as escrow agent by breaching its fiduciary duties by assisting Enis, Strategica and SWP to obtain the release of Ginsburg's funds held in escrow by Royal Title contrary to Ginsburg's authorization.

282.    Cook, Kranz, Gilda Burstein and Susan Enis agreed to serve as straw persons/designees for Strategica, Enis and Burstein to receive stock in Nationwide and become signatories to the Shareholders Agreement.

283.    These actions were overt actions intended to achieve Strategica, Enis and Burstein's scheme.

284.    As co-conspirators of Strategica, Enis and Burstein, Lieber, the Ritter Firm, Glikman, Shiboleth, Cook, Kranz, Gilda Burstein and Susan Enis benefitted from the fraudulent and wrongful scheme.

285.    As a result of the conspiracy and fraudulent scheme, Ginsburg has suffered damages substantially in excess of $75,000.00.

286.    Defendants acted maliciously and engaged in intentional misconduct and had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to Ginsburg would result and intentionally pursued that conduct resulting in injury to Ginsburg.

WHEREFORE, Plaintiff, Ginsburg, hereby demands judgment against the Defendants, Enis, Burstein, Strategica, SWP, Lieber, the Ritter Firm, Royal Title, Glikman, Shiboleth, Cook, Kranz, Susan Enis and Gilda Burstein, for compensatory damages substantially in excess of $75,000.00, punitive damages of at least $10,000,000 or more, together with awarding Ginsburg his costs and disbursements, pre-judgment interest, and such other and further relief as this Court deems just, equitable and proper.

## COUNT V –CONSPIRACY  - NATIONWIDE v. STRATEGICA, ENIS, BURSTEIN, GLIKMAN, SHIBOLETH, COOK, KRANZ, GILDA BURSTEIN, SUSAN ENIS

287.     Nationwide repeats and realleges each and every allegation contained in Paragraphs 1 through 28 and 154 through 234 above as if set forth herein in full.

288.     This is an action for damages sustained by Nationwide substantially in excess of $75,000.00 on account of the Defendants' conspiracy

289.     The Defendants agreed and conspired to defraud Ginsburg and Nationwide, and breach fiduciary duties owed to Ginsburg and Nationwide.

290.     Burstein and Enis breached their fiduciary duties to Nationwide.

291.     Strategica, Enis and Burstein committed fraud on Nationwide.

292.     Glikman and Shiboleth intentionally violated their professional obligations and fiduciary duties to Nationwide and Ginsburg.

293.     Cook, Kranz, Gilda Burstein and Susan Enis agreed to serve as straw persons/designees for Strategica, Enis and Burstein to receive stock in Nationwide and become signatories to the Shareholders Agreement.

294.     These actions were overt actions intended to achieve Strategica, Enis and Burstein's scheme.

295.     As co-conspirators of Strategica, Enis and Burstein, Glikman, Shiboleth, Cook, Kranz, Gilda Burstein and Susan Enis benefitted from the fraudulent and wrongful scheme.

296.     As a result of the conspiracy and fraudulent scheme, Nationwide has

suffered damages substantially in excess of $75,000.00.

297.    Defendants acted maliciously and engaged in intentional misconduct and had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to Nationwide would result and intentionally pursued that conduct resulting in injury to Nationwide.

WHEREFORE, Plaintiff, Nationwide, hereby demands judgment against the Defendants, Enis, Burstein, Strategica, Glikman, Shiboleth, Cook, Kranz, Susan Enis and Gilda Burstein, for compensatory damages substantially in excess of $75,000.00, punitive damages of at least $10,000,000 or more, together with awarding Nationwide its costs and disbursements, pre-judgment interest, and such other and further relief as this Court deems just, equitable and proper.

## COUNT VI – LEGAL MALPRACTICE – NEGLIGENCE - GINSBURG v. LIEBER AND RITTER FIRM

298.    Ginsburg repeats and realleges each and every allegation contained in Paragraphs 1 through 234 above as if set forth herein in full.

299.    This is an action for damages sustained by Ginsburg substantially in excess of $75,000.00 as a result of the legal malpractice committed by Lieber and the Ritter Firm.

300.    Lieber and the Ritter Firm represented Ginsburg in connection with the Palm Beach real estate transaction.

301.    Lieber and the Ritter Firm owed a duty to Ginsburg to exercise that degree

of care and skill as would be exercised by other reasonably skilled attorneys under the circumstances.

302.    Lieber and the Ritter Firm neglected a reasonable duty to Ginsburg to exercise that degree of care and skill as would be exercised by other reasonably skilled attorneys under the circumstances.

303.    Ginsburg did not discover this cause of action and could not have discovered this cause of action with due diligence  until Enis's representations regarding his resolving the BankFirst and Beher lawsuits turned out to be untrue in 2009.

304.    As a result and proximate result of the negligence of Lieber and the Ritter Firm, Ginsburg has sustained damages substantially in excess of $75,000.00.

WHEREFORE, Plaintiff, Ginsburg, hereby demands judgment against the Defendants, Lieber and the Ritter Firm, for compensatory damages substantially in excess of $75,000.00, together with awarding Ginsburg his costs and disbursements, pre-judgment interest, and such other and further relief as this Court deems just, equitable and proper.

## COUNT VII – LEGAL MALPRACTICE – BREACH OF FIDUCIARY DUTY GINSBURG v. LIEBER AND RITTER FIRM

305.    Ginsburg repeats and realleges each and every allegation contained in Paragraphs 1 through 234 above as if set forth herein in full.

306.    This is an action for damages sustained by Ginsburg substantially in excess of $75,000.00 as a result of the legal malpractice committed by Lieber and the Ritter

Firm.

307.    Lieber and the Ritter Firm represented Ginsburg in connection with the Palm Beach real estate transaction.

308.    As Ginsburg's attorneys, Lieber and the Ritter Firm owed fiduciary duties to Ginsburg.

309.    Lieber and the Ritter Firm breached their fiduciary duties to Ginsburg by:

A.    Failing to inform Ginsburg of the MJ Mezz Loan or explain it to him;

B.    Failing to review the BankFirst Loan documents with Ginsburg and failing to advise him of the one year term of the loan;

C.    Failing to advise Ginsburg to secure his own independent counsel;

D.    Following the instructions and looking out for the interests of Strategica, SWP, Enis and Burstein to the detriment of Ginsburg;

E.    Proceeding with the representation although they possessed an irreconcilable conflict of interest;

F.    Failing to advise Ginsburg of the potential risk he faced under the BankFirst Guaranty, the MJ Mezz Loan Guaranty or the Beher Mezz Loan Guaranty;

G.    Failing to advise Ginsburg that Weingartner was not guaranteeing the BankFirst Loan;

H.    Failing to advise Ginsburg regarding the Beher Mezz Loan;

I.    Failing to advise Ginsburg that Barna did not agree to the extension of the BankFirst Loan; and

J.     Releasing the South Beach Hotel Funds held in the Royal Title Escrow account.

310.   Ginsburg did not discover this cause of action and could not have discovered this cause of action with due diligence until Enis's representations regarding his resolving the BankFirst and Beher lawsuits turned out to be untrue in 2009.

311.   As a result and proximate result of the negligence of Lieber and the Ritter Firm, Ginsburg has sustained damages substantially in excess of $75,000.00.

WHEREFORE, Plaintiff, Ginsburg, hereby demands judgment against the Defendants, Lieber and the Ritter Firm, for compensatory damages substantially in excess of $75,000.00, together with awarding Ginsburg his costs and disbursements, pre-judgment interest, and such other and further relief as this Court deems just, equitable and proper.

## COUNT VIII – LEGAL MALPRACTICE – NEGLIGENCE v. GLIKMAN AND SHIBOLETH

312.   Ginsburg repeats and realleges each and every allegation contained in Paragraphs 1 through 234 above as if set forth herein in full. Nationwide repeats and realleges each and every allegation contained in Paragraphs 1 through 28 and 154 through 234 above as if set forth herein in full.

313.   This is an action for damages sustained by Ginsburg and Nationwide substantially in excess of $75,000.00 as a result of the legal malpractice committed by Glikman and Shiboleth.

314.     Glikman and Shiboleth represented Ginsburg and Nationwide in connection with the negotiation, preparation and execution of the Consulting Agreement and Shareholders Agreement.

315.     Glikman violated Florida Bar Rule 4-5.5 and engaged in the unlicensed practice of law in Florida.

316.     Glikman and Shiboleth owed a duty to Plaintiffs to exercise that degree of care and skill as would be exercised by other reasonably skilled attorneys under the circumstances.

317.     Glikman and Shiboleth neglected a reasonable duty to Plaintiffs to exercise that degree of care and skill as would be exercised by other reasonably skilled attorneys under the circumstances.

318.     Glikman and Shiboleth neglected their reasonable duty to Plaintiffs by representing all parties in the negotiation, drafting and execution of the Shareholders Agreement and Consulting Agreement.

319.     Ginsburg and Nationwide on the one hand, and Strategica, Enis, Burstein, Gilda Burstein, Susan Enis, Cook and Kranz on the other hand, had fundamentally antagonistic interests in the transaction comparable to a buyer and a seller.

320.     A disinterested lawyer would conclude that Ginsburg and Nationwide should not have agreed to the joint representation.

321.     Under both the legal rules of ethics of Florida and New York, the conflict of interest was not waivable.

322.   Nevertheless, Glikman and Shiboleth requested that Ginsburg and Nationwide sign a letter waiving the conflict of interest. They further inserted provisions into the Shareholders Agreement and Consulting Agreement purporting to waive the conflict of interest.

323.   Because of the conflict of interest, Glikman and Shiboleth assisted Strategica, Enis and Burstein to defraud Ginsburg and Nationwide and allowed Ginsburg to give away 50% of Nationwide to Strategica, Enis, Burstein, Gilda Burstein, Susan Enis, Cook and Kranz for absolutely nothing in return.

324.   Glikman and Shiboleth favored the interests of Strategica, Enis and Burstein over the interests of Ginsburg and Nationwide.

325.   Plaintiffs did not discover this cause of action and could not have discovered this cause of action with due diligence until the relationship between Ginsburg, Nationwide, Strategica, Enis and Burstein deteriorated in March-April 2009.

326.   As a result and proximate result of the negligence of Glikman and Shiboleth, Plaintiffs have sustained damages substantially in excess of $75,000.00.

WHEREFORE, Plaintiffs, Ginsburg and Nationwide, hereby demand judgment against the Defendants, Glikman and Shiboleth, for compensatory damages substantially in excess of $75,000.00, together with awarding Plaintiffs their attorneys' fees, costs and disbursements, pre-judgment interest, and such other and further relief as this Court deems just, equitable and proper.

## COUNT IX – LEGAL MALPRACTICE –BREACH OF FIDUCIARY DUTY
## v. GLIKMAN AND SHIBOLETH

327.    Ginsburg repeats and realleges each and every allegation contained in Paragraphs 1 through 234 above as if set forth herein in full.  Nationwide repeats and realleges each and every allegation contained in Paragraphs 1 through 28 and 154 through 234.

328.    This is an action for damages sustained by Ginsburg and Nationwide substantially in excess of $75,000.00 as a result of the legal malpractice committed by Glikman and Shiboleth.

329.    Glikman and Shiboleth represented Ginsburg and Nationwide in connection with the negotiation, preparation and execution of the Consulting Agreement and Shareholders Agreement.

330.    Glikman violated Florida Bar Rule 4-5.5 and engaged in the unlicensed practice of law in Florida.

331.    As Plaintiffs' attorneys, Glikman and Shiboleth owed fiduciary duties to Plaintiffs.

332.    Glikman and Shiboleth breached their fiduciary duties to Plaintiffs by representing all parties in the negotiation, drafting and execution of the Shareholders Agreement and Consulting Agreement.

333.    Ginsburg and Nationwide on the one hand, and Strategica, Enis, Burstein,

Gilda Burstein, Susan Enis, Cook and Kranz on the other hand, had fundamentally antagonistic interests in the transaction comparable to a buyer and a seller.

334.    A disinterested lawyer would conclude that Ginsburg and Nationwide should not have agreed to the joint representation.

335.    Under both the legal rules of ethics of Florida and New York, the conflict of interest was not waivable.

336.    Nevertheless, Glikman and Shiboleth requested that Ginsburg and Nationwide sign a letter waiving the conflict of interest.  They further inserted provisions into the Shareholders Agreement and Consulting Agreement purporting to waive the conflict of interest.

337.    Because of the conflict of interest, Glikman and Shiboleth assisted Strategica, Enis and Burstein to defraud Ginsburg and Nationwide and allowed Ginsburg to give away 50% of Nationwide to Strategica, Enis, Burstein, Gilda Burstein, Susan Enis, Cook and Kranz for absolutely nothing in return.

338.    Glikman and Shiboleth favored the interests of Strategica, Enis and Burstein over the interests of Ginsburg and Nationwide.

339.    Plaintiffs did not discover this cause of action and could not have discovered this cause of action with due diligence until the relationship between Ginsburg, Nationwide, Strategica, Enis and Burstein deteriorated in March-April 2009.

340.    As a direct and proximate result of the breaches of fiduciary duty of Glikman and Shiboleth, Plaintiffs have sustained damages substantially in excess of

$75,000.00.

WHEREFORE, Plaintiffs, Ginsburg and Nationwide, hereby demand judgment against the Defendants, Glikman and Shiboleth, for compensatory damages substantially in excess of $75,000.00, together with awarding Plaintiffs their attorneys' fees, costs and disbursements, pre-judgment interest, and such other and further relief as this Court deems just, equitable and proper.

## COUNT X –FRAUDULENT INDUCEMENT v. STRATEGICA, ENIS AND BURSTEIN (Consulting Agreement and Shareholders Agreement)

341.    Ginsburg repeats and realleges each and every allegation contained in Paragraphs 1 through 234 above as if set forth herein in full.  Nationwide repeats and realleges each and every allegation contained in Paragraphs 1 through 28 and 154 through 234 above as if set forth herein in full.

342.    This is an action for damages sustained by Ginsburg and Nationwide substantially in excess of $75,000.00 as a result of the fraudulent inducement of Strategica, Enis and Burstein.

343.    Ginsburg/Nationwide executed the Consulting Agreement and Shareholders Agreement based upon the express misrepresentations of Strategica, Enis and Burstein.

344.    In fact, but for the misrepresentations of Strategica, Enis and Burstein, Ginsburg/Nationwide would not have executed the Consulting Agreement and Shareholders Agreement.

345.    Strategica, Enis and Burstein, falsely represented that they would fund the

$4,000,000 payment to Pachter memorialized in the Satisfaction Agreement. Strategic, Enis and Burstein's representations were made prior to the execution of the Consulting Agreement and Shareholders Agreement.

346.    Strategica, Enis and Burstein, falsely represented that they would provide "intellectual capital" to Nationwide and provide approximately $40,000,000 in value to Nationwide.

347.    Strategica, Enis and Burstein made the aforesaid misrepresentations and/or omissions, knowingly and willfully, and fully intending that Plaintiffs would rely upon the same.

348.    At the time of their representations, Strategica, Enis and Burstein knew or should have known that the same were false and/or that they were failing to disclose material facts.

349.    At the time of their representations and/or omissions, Strategica, Enis and Burstein also knew or should have known that they were not capable of performing as represented, and had no intention of performing as represented.

350.    As a direct and proximate result of the aforesaid fraudulent conduct, Plaintiffs suffered damages substantially in excess of $75,000.00.

351.    Defendants, Strategica, SWP, Enis and Burstein acted maliciously and engaged in intentional misconduct and had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to Plaintiffs would result and intentionally pursued that conduct resulting in injury to Plaintiffs.

WHEREFORE, Plaintiffs, Ginsburg and Nationwide, hereby demand judgment against the Defendants, Strategica, Enis and Burstein, for compensatory damages substantially in excess of $75,000.00, punitive damages of at least $10,000,000 or more, together with awarding Plaintiffs their costs and disbursements, pre-judgment interest, and such other and further relief as this Court deems just, equitable and proper.

### COUNT XI– RESCISSION  - NATIONWIDE v. STRATEGICA (Consulting Agreement)

352.    Nationwide repeats and realleges each and every allegation contained in Paragraphs 1 through 28 and 154 through 234 above as if set forth herein in full.

353.    This is an action by Nationwide to rescind the Consulting Agreement executed by Ginsburg for Nationwide and Burstein for Strategica.

354.    Ginsburg/Nationwide executed the Consulting Agreement based upon the express misrepresentations of Strategica, Enis and Burstein.

355.    In fact, but for the misrepresentations of Strategica, Enis and Burstein, Ginsburg/Nationwide would not have executed the Consulting Agreement.

356.    The obligations of the Consulting Agreement are illusory as there is no mutuality of obligation.  Nationwide was required to issued 50% of its stock to the Strategica designees and pay $60,000 a month to Strategica, while Strategica retains sole control and discretion as to how and if it would perform any services.

357.    There was also a total failure of consideration under the Consulting Agreement.

58

358.    Strategica also breached a dependent covenant of entering the Consulting Agreement.

359.    Strategica was required to fund the $4,000,000 buyout of the previous settlement agreement as a dependent covenant of entering the Consulting Agreement

360.    Strategica breached the dependent covenant by failing to pay any funds in connection with satisfying and discharging the amounts owed under the settlement, requiring Nationwide to secure funding from a third party.

361.    All parties necessary for the rescission of the Consulting Agreement are joined as parties hereto.

362.    Strategica, Enis and Burstein have defrauded Ginsburg and Nationwide solely in an effort to financially benefit themselves, and/or obtain an interest therein, and their conduct in this regard was done with the intent to defraud Ginsburg and Nationwide.

363.    Nationwide hereby demands that Strategica rescind the Consulting Agreement.

364.    Although Strategica has profited under the Consulting Agreement at Nationwide's expense due to Strategica, Enis and Burstein's fraud, to the extent Nationwide has received benefits under the Consulting Agreement, Nationwide hereby offers to restore those benefits to Strategica, if possible.

365.    As a result of the fraud and misrepresentations of Strategica, Enis and Burstein, the lack of mutuality of obligation, the breach of a dependent covenant, and the total failure of consideration, the Consulting Agreement should be rescinded in its

entirety so that the parties are returned to the *status quo* immediately prior to the execution of the Consulting Agreement.

366. Nationwide has no adequate remedy at law unless the Consulting Agreement is rescinded.

WHEREFORE, Plaintiff, Nationwide, respectfully requests that this Court take jurisdiction of this cause and the parties hereto, and thereafter enter a Judgment rescinding the Consulting Agreement, and further decreeing that the parties be restored to the *status quo* immediately prior to the execution of the Agreement, together with awarding together with awarding Nationwide its costs and disbursements, pre-judgment interest, and such other and further relief as this Court deems just, equitable and proper.

## COUNT XII – RESCISSION - v. COOK, KRANZ, SUSAN ENIS, and GILDA BURSTEIN (Shareholders Agreement)

367. Ginsburg repeats and realleges each and every allegation contained in Paragraphs 1 through 234 above as if set forth herein in full. Nationwide repeats and realleges each and every allegation contained in Paragraphs 1 through 28 and 154 through 234 above as if set forth herein in full.

368. This is an action to rescind the Shareholders Agreement executed by Ginsburg, Ricki, Nationwide, Cook, Kranz, Gilda Enis and Susan Enis.

369. Plaintiffs executed the Shareholders Agreement based upon the express misrepresentations of Strategica, Enis and Burstein.

370. In fact, but for the misrepresentations of Strategica, Enis and Burstein,

Plaintiffs would not have executed the Shareholders Agreement.

371.    The Shareholders Agreement was entered as a byproduct of the Consulting Agreement.

372.    The obligations of the Consulting Agreement are illusory as there is no mutuality of obligation.  Nationwide was required to issued 50% of its stock to the Strategica designees and pay $60,000 a month to Strategica, while Strategica retains sole control and discretion as to how and if it would perform any services.

373.    There was also a total failure of consideration and breach of a dependent covenant.

374.    Strategica was required to fund the $4,000,000 buyout of the previous settlement agreement as a dependent covenant of entering the Consulting Agreement and Shareholders Agreement.

375.    Strategica breached the dependent covenant by failing to pay any funds in connection with satisfying and discharging the amounts owed under the settlement, requiring Nationwide to secure funding from a third party.

376.    All parties necessary for the rescission of the Shareholders Agreement are joined as parties hereto.

377.    Strategica, Enis and Burstein have defrauded Ginsburg and Nationwide solely in an effort to financially benefit themselves, and/or obtain an interest therein, and their conduct in this regard was done with the intent to defraud Ginsburg and Nationwide.

378.    Plaintiffs hereby demand that Cook, Kranz, Gilda Enis and Susan Enis

61

rescind the Shareholders Agreement.

379.    Although Strategica, Cook, Kranz, Gilda Enis and Susan Enis have profited under the Shareholders Agreement at Ginsburg/Nationwide's expense due to Strategica, Enis and Burstein's fraud, to the extent Ginsburg/Nationwide have received benefits under the Shareholders Agreement, Ginsburg/Nationwide hereby offer to restore those benefits to Strategica, Cook, Kranz, Gilda Enis and Susan Enis, if possible.

380.    As a result of the fraud and misrepresentations of Strategica, Enis and Burstein, the lack of mutuality of obligation, the breach of a dependent covenant, and the total failure of consideration, the Shareholders Agreement should be rescinded in their entirety so that the parties are returned to the *status quo* immediately prior to the execution of the Shareholders Agreement.

381.    Plaintiffs have no adequate remedy at law unless the Shareholders Agreement is rescinded.

WHEREFORE, Plaintiffs, Ginsburg and Nationwide, respectfully request that this Court take jurisdiction of this cause and the parties hereto, and thereafter enter a Judgment rescinding the Shareholders Agreement, cancelling the Nationwide stock issued to Cook, Kranz, Gilda Enis and Susan Enis and further decreeing that the parties be restored to the *status quo* immediately prior to the execution of the Shareholders Agreement, together with awarding together with awarding Plaintiffs their costs and disbursements, pre-judgment interest, and such other and further relief as this Court deems just, equitable and proper.

62

## COUNT XIII – MONEY LENT - GINSBURG v. ENIS

382.    Ginsburg repeats and realleges each and every allegation contained in Paragraphs 1 through 234 above as if set forth herein in full.

383.    This is an action for damages sustained by Ginsburg substantially in excess of $75,000.00.

384.    On or about April 11, 2007, Ginsburg loaned Enis $2,300,000, plus 6% interest, in connection with the BankFirst loan extension.

385.    Ginsburg and Enis agreed that the funds would be repaid within ninety (90) days.

386.    Enis agreed to personally repay the money lent.

387.    Defendant, Enis, owes Ginsburg $2,300,000, plus interest.

WHEREFORE, Plaintiff, Ginsburg, hereby demands judgment against the Defendant, Enis, for money damages substantially in excess of $75,000.00, together with awarding Ginsburg his costs and disbursements, pre-judgment interest, and such other and further relief as this Court deems just, equitable and proper.

## COUNT XIV –CONVERSION – GINSBURG v. ENIS

388.    Ginsburg repeats and realleges each and every allegation contained in Paragraphs 1 through 234 above as if set forth herein in full.

389.    This is an action for damages sustained by Ginsburg substantially in excess of $75,000.00 on account of conversion by Enis.

390.    On or about April 11, 2007, Enis convinced Ginsburg to allow the $2,300,000 in the Ritter Firm/Royal Title's escrow account to be released pursuant to Enis' instructions.

391.    Ginsburg and Enis agreed that the funds would be repaid within ninety (90) days.

392.    Enis agreed to personally repay the money.

393.    Enis was aware that Ginsburg needed the funds to build his home.

394.    Despite demand by Ginsburg, Enis has refused to return the funds.

395.    Enis obtained the funds by false pretenses and fraud.

396.    Ginsburg has a present immediate possessory right to the $2,300,000.

397.    As a result of Enis's wrongful and improper use of Ginsburg's funds, Ginsburg has suffered damages substantially in excess of $75,000.00.

398.    Enis acted maliciously and engaged in intentional misconduct and had actual knowledge of the wrongfulness of his conduct and the high probability that injury or damage to Ginsburg would result and intentionally pursued that conduct resulting in injury to Ginsburg.

WHEREFORE, Plaintiff, Ginsburg, hereby demands judgment against the Defendant, Enis, for compensatory damages substantially in excess of $75,000.00, punitive damages of at least $10,000,000 or more, together with awarding Ginsburg his costs and disbursements, pre-judgment interest, and such other and further relief as this Court deems just, equitable and proper.

64

## COUNT XV – NEGLIGENCE AS ESCROW AGENT - GINSBURG v. ROYAL TITLE, LIEBER AND RITTER FIRM

399.    Ginsburg repeats and realleges each and every allegation contained in Paragraphs 1 through 234 above as if set forth herein in full.

400.    This is an action for damages sustained by Ginsburg substantially in excess of $75,000.00 as a result of the negligence committed by Royal Title, Lieber and the Ritter Firm.

401.    In 2006, Ginsburg deposited $2,300,000 into escrow with Royal Title and/or the Ritter Firm serving as escrow agent.  As such, Royal Title, Lieber and the Ritter Firm owed a fiduciary duty to Ginsburg.

402.    The funds were to be held in escrow and not used to fund Strategica, Enis and Burstein's hotel projects.

403.    Royal Title, Lieber and the Ritter Firm were to provide an accounting to Ginsburg of how the funds were allocated.

404.    Royal Title, Lieber and the Ritter Firm failed to provide Ginsburg with any accounting of the funds deposited into the escrow account, until they provided a partial accounting after being subpoenaed by Ginsburg in December 2009.

405.    In April 2007, Royal Title and the Ritter Firm assisted Enis to convince Ginsburg to release the escrowed funds to Strategica, SWP and/or Enis.

406.    Ginsburg's agreement to release the funds in April 2007 was obtained by

fraudulent representations and omissions in that Ginsburg was not advised:

        A.     that the BankFirst Loan had a one year term, had matured, and that Enis, Strategica and SWP needed the funds to cover the interest on the extended loan; and

        B.     that the Beher Mezz Loan was being taken out to pay off the MJ Mezz Loan.

407. Royal Title did not release most of Ginsburg's funds to refinance SWP's mezzanine loan, but instead wired the funds to BankFirst to extend the BankFirst Loan. This did not comply with the April 11, 2007 written authorization from Ginsburg.

408. On or about September 2008, Royal Title release approximately $210,000 to Strategica Realty without Ginsburg's authorization.

409. Royal Title failed to pay Ginsburg any interest on the escrowed $2,300,000. Upon information and belief, Royal Title paid any interest earned on the $2,300.000 to Strategica or Strategica Realty without Ginsburg's authorization.

410. Royal Title, Lieber and the Ritter Firm owed a reasonable duty to Ginsburg as escrow agent.

411. Royal Title, Lieber and the Ritter Firm neglected a reasonable duty to Ginsburg as escrow agent and failed to follow their instructions as escrow agent.

412. As a result and proximate result of the negligence of Royal Title, Lieber and the Ritter Firm, Ginsburg has sustained damages substantially in excess of $75,000.00.

WHEREFORE, Plaintiff, Ginsburg, hereby demands judgment against the Defendants, Royal Title, Lieber and the Ritter Firm, for compensatory damages

substantially in excess of $75,000.00, for an accounting of Ginsburg's funds held in escrow by Royal Title, Lieber and the Ritter Firm, together with awarding Ginsburg his costs and disbursements, pre-judgment interest, and such other and further relief as this Court deems just, equitable and proper.

### COUNT XVI –BREACH OF FIDUCIARY DUTY AS ESCROW AGENT - GINSBURG v. ROYAL TITLE, LIEBER AND RITTER FIRM

413.    Ginsburg repeats and realleges each and every allegation contained in Paragraphs 1 through 234 above as if set forth herein in full.

414.    This is an action for damages sustained by Ginsburg substantially in excess of $75,000.00 as a result of the breach of fiduciary duty committed by Royal Title, Lieber and the Ritter Firm.

415.    In 2006, Ginsburg deposited $2,300,000 into escrow with Royal Title and/or the Ritter Firm serving as escrow agent.  As such, Royal Title, Lieber and the Ritter Firm owed a fiduciary duty to Ginsburg.

416.    The funds were to be held in escrow and not used to fund Strategica, Enis and Burstein's hotel projects.

417.    Royal Title, Lieber and the Ritter Firm were to provide an accounting to Ginsburg of how the funds were allocated.

418.    Royal Title, Lieber and the Ritter Firm failed to provide Ginsburg with an accounting of the funds deposited into the escrow account until they provided a partial accounting after being subpoenaed by Ginsburg in December 2009.

419.    In April 2007, Royal Title and the Ritter Firm assisted Enis to convince Ginsburg to release the escrowed funds to Strategica, SWP and/or Enis.

420.    Ginsburg's agreement to release the funds in April 2007 was obtained by fraudulent representations and omissions in that Ginsburg was not advised:

A.    that the BankFirst Loan had a one year term, had matured, and that Enis, Strategica and SWP needed the funds to cover the interest on the extended loan; and

B.    that the Beher Mezz Loan was being taken out to pay off the MJ Mezz Loan.

421.    Royal Title did not release most of Ginsburg's funds to refinance SWP's mezzanine loan, but instead wired the funds to BankFirst to extend the BankFirst Loan. This did not comply with the April 11, 2007 written authorization from Ginsburg.

422.    On or about September 2008, Royal Title release approximately $210,000 to Strategica Realty without Ginsburg's authorization.

423.    Royal Title failed to pay Ginsburg any interest on the escrowed $2,300,000. Upon information and belief, Royal Title paid any interest earned on the $2,300.000 to Strategica or Strategica Realty without Ginsburg's authorization.

424.    Royal Title, Lieber and the Ritter Firm breached their fiduciary duty to Ginsburg as escrow agent and failed to follow their instructions as escrow agent.

425.    As a result and proximate result of the breach of fiduciary duty of Royal Title, Lieber and the Ritter Firm, Ginsburg has sustained damages substantially in excess of $75,000.00.

WHEREFORE, Plaintiff, Ginsburg, hereby demands judgment against the Defendants, Royal Title, Lieber and the Ritter Firm, for compensatory damages substantially in excess of $75,000.00, for an accounting of Ginsburg's funds held in escrow by Royal Title, Lieber and the Ritter Firm, together with awarding Ginsburg his costs and disbursements, pre-judgment interest, and such other and further relief as this Court deems just, equitable and proper.

## COUNT XVII –COMMON LAW FRAUD – GINSBURG and NATIONWIDE v. ENIS, BURSTEIN, STRATEGICA, SWP

426.    Ginsburg repeats and realleges each and every allegation contained in Paragraphs 1 through 234 above as if set forth herein in full.  Nationwide repeats and realleges each and every allegation contained in Paragraphs 1 through 28 and 154 through 234 above as if set forth herein in full.

427.    This is an action for damages sustained by Ginsburg and Nationwide substantially in excess of $75,000.00 as a result of the fraud committed by Strategica, Enis, Burstein and SWP.

428.    In early 2006, Strategica, Enis and Burstein hatched a scheme to defraud Ginsburg and Nationwide.

429.    The first part of the scheme involved tricking Ginsburg to guaranty the BankFirst loan in an amount in excess of $36,000,000, while Strategica, Enis and Burstein paid no money and had no risk in connection with the Palm Beach transaction.

430.    In February through April 2006, Strategica, SWP, Enis and Burstein, and

their agents and representatives made various and numerous misrepresentations and false statements to Ginsburg to get him to execute the guaranties for the BankFirst loan,

431.    Specifically, Strategica, SWP, Enis and Burstein, in concert with each other, made the following false and fraudulent misrepresentations:

A.    that Strategica/SWP had sufficient deposits to carry the interest on the BankFirst loan for three (3) years;

B.    that the $36,000,000 loan "will be eliminated as part of the construction loan."

C.    that "[b]ased on the pre-sales we believe that we'll be in the 'ground' by 8/1/96 (completed and delivered Phase I by 12/31/07)";

D.    that Ginsburg's exposure "is covered by the $8.0m escrow";

E.    that Enis, Burstein, Strategica, SWP (and their affiliates) were not taking money out from the loan closing;

F.    that Weingartner was going to guaranty the BankFirst Loan;

G.    that Ginsburg would receive $600,000;

H.    that the Palm Beach Property was worth at least $75,000,000; and

I.    that the term of the BankFirst Loan was a three (3) year loan.

432.    These representations were false.

433.    Strategica, SWP, Enis and Burstein also committed fraudulent omission by failing to inform Ginsburg of the MJ Lending Mezz Loan. They intentionally deceived Ginsburg into signing the MJ Lending Mezz Loan by inserting it into the closing papers

to be signed without ever informing Ginsburg of its existence.

434.    Strategica, SWP, Enis and Burstein made the aforesaid misrepresentations, knowingly and willfully, and fully intending that Ginsburg rely upon the same.

435.    At the time of their representations, Strategica, SWP, Enis and Burstein knew or should have known that the same were false and/or that they were failing to disclose material facts.

436.    At the time of their representations, Strategica, SWP, Enis and Burstein also knew or should have known that they were not capable of performing as represented, and had no intention of performing as represented.

437.    Ginsburg executed the BankFirst guaranty in justifiable reliance upon Strategica, SWP, Enis and Burstein's fraudulent misrepresentations and/or omissions as aforesaid.

438.    Ginsburg did not even know that he executed the MJ Mezz Loan Guaranty. He did so as a result of the fraudulent misrepresentations and/or omissions of Strategica, SWP, Enis and Burstein.

439.    In April 2007, Strategica, SWP, Enis and Burstein, and their agents and representatives, effectuated the second part of their fraudulent plan when they made various and numerous misrepresentations and false statements to Ginsburg to get him to execute the consent to continue guaranteeing the BankFirst loan when it was extended, to release the $2,300,000, plus interest, held in the Royal Title escrow account, and to sign the guaranty for the Beher Mezz Loan.

440.    Specifically, Strategica, SWP, Enis and Burstein, in concert with each other, repeated the following false and fraudulent misrepresentations:

A.    that Strategica/SWP had sufficient deposits to carry the interest on the BankFirst loan for three (3) years;

B.    that the $36,000,000 loan "will be eliminated as part of the construction loan"; and

C.    that Ginsburg's exposure "is covered by the $8.0m escrow."

441.    Strategica, SWP, Enis and Burstein, in concert with each other, also made the following new false and fraudulent misrepresentations:

A.    that Enis was going to find a buyer to purchase The Lakes and pay off the BankFirst Loan;

B.    that Enis was going to repay the $2,300,000 plus interest to Ginsburg; and

C.    that Barna had agreed to the extension of the BankFirst Loan.

442.    Strategica, SWP, Enis and Burstein, in concert with each other, committed material fraudulent omissions by failing to inform Ginsburg:

A.    that the BankFirst Loan had a one year term, had matured, and that they needed the funds to cover the interest on the extended loan; and

B.    that the Beher Mezz Loan was being taken out to pay off the MJ Mezz Loan.  They did not disclose, explain or discuss the Beher Mezz Loan with Ginsburg.

72

443.    Upon information and belief, Strategica, SWP, Enis or Burstein, forged or caused Barna's signature to be forged on the BankFirst Loan extension and the Beher Mezz Loan Guaranty.

444.    These representations and omissions were false.

445.    Strategica, SWP, Enis and Burstein made the aforesaid misrepresentations and/or omissions, knowingly and willfully, and fully intending that Ginsburg rely upon the same.

446.    At the time of their representations, Strategica, SWP, Enis and Burstein knew or should have known that the same were false and/or that they were failing to disclose material facts.

447.    At the time of their representations and/or omissions, Strategica, SWP, Enis and Burstein also knew or should have known that they were not capable of performing as represented, and had no intention of performing as represented.

448.    Ginsburg executed the BankFirst extension and signed a document purporting to be the signature page of the guaranty of the Beher Mezz Loan in justifiable reliance upon Strategica, SWP, Enis and Burstein's fraudulent misrepresentations and/or omissions as aforesaid.

449.    The next part of their scheme to defraud was to convince Nationwide and Ginsburg to sign the Consulting Agreement and Shareholders Agreement. Strategica, Enis and Burstein, falsely represented that they would fund the $4,000,000 payment to Pachter memorialized in the Satisfaction Agreement.

450.    Strategica, Enis and Burstein, falsely represented that they would provide "intellectual capital" to Nationwide and provide approximately $40,000,000 in value to Nationwide.

451.    Strategica, Enis and Burstein made the aforesaid misrepresentations and/or omissions, knowingly and willfully, and fully intending that Plaintiffs would rely upon the same.

452.    Plaintiffs justifiably relied upon the aforesaid misrepresentations in entering into the Consulting Agreement and Shareholders Agreement.

453.    As a result of the fraud of Enis, Burstein, Strategica and SWP, Plaintiffs have suffered damages substantially in excess of $75,000.00.

454.    Defendants, Strategica, SWP, Enis and Burstein acted maliciously and engaged in intentional misconduct and had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to Plaintiffs would result and intentionally pursued that conduct resulting in injury to Plaintiffs.

WHEREFORE, Plaintiffs, Ginsburg and Nationwide, hereby demand judgment against the Defendants, Enis, Burstein, Strategica, and SWP, for compensatory damages substantially in excess of $75,000.00, punitive damages of at least $10,000,000 or more, together with awarding Plaintiffs their costs and disbursements, pre-judgment interest, and such other and further relief as this Court deems just, equitable and proper.

**COUNT XVIII –NEGLIGENT MISREPRESENTATION – GINSBURG and NATIONWIDE v. ENIS, BURSTEIN, STRATEGICA, SWP**

455.    Ginsburg repeats and realleges each and every allegation contained in Paragraphs 1 through 234 above as if set forth herein in full.  Nationwide repeats and realleges each and every allegation contained in Paragraphs 1 through 28 and 154 through 230 above as if set forth herein in full.

456.    This is an action for damages sustained by Plaintiffs substantially in excess of $75,000.00 as a result of the negligent misrepresentations committed by Strategica, Enis, Burstein and SWP.

457.    In February through April 2006, Strategica, SWP, Enis and Burstein, and their agents and representatives made various and numerous misrepresentations and false statements to Ginsburg to get him to execute the guaranties for the BankFirst loan,

458.    Specifically, Strategica, SWP, Enis and Burstein, in concert with each other, made the following false misrepresentations:

A.    that Strategica/SWP had sufficient deposits to carry the interest on the BankFirst loan for three (3) years;

B.    that the $36,000,000 loan "will be eliminated as part of the construction loan."

C.    that "[b]ased on the pre-sales we believe that we'll be in the 'ground' by 8/1/96 (completed and delivered Phase I by 12/31/07)";

D.    that Ginsburg's exposure "is covered by the $8.0m escrow";

E.    that Enis, Burstein, Strategica, SWP (and their affiliates) were not taking money out from the loan closing;

F.      that Weingartner was going to guaranty the BankFirst Loan;

G.      that Ginsburg would receive $600,000;

H.      that the Palm Beach Property was worth at least $75,000,000; and

I.      that the term of the BankFirst Loan was a three (3) year loan.

459.    These representations were false.

460.    Strategica, SWP, Enis and Burstein also committed negligent omission by failing to inform Ginsburg of the MJ Lending Mezz Loan, and inserting the MJ Lending Mezz Loan Guaranty into the closing papers to be signed without ever informing Ginsburg of its existence.

461.    In April 2007, Strategica, SWP, Enis and Burstein, SWP, repeated the following false misrepresentations:

A.      that Strategica/SWP had sufficient deposits to carry the interest on the BankFirst loan for three (3) years;

B.      that the $36,000,000 loan "will be eliminated as part of the construction loan"; and

C.      that Ginsburg's exposure "is covered by the $8.0m escrow."

462.    Strategica, SWP, Enis and Burstein, in concert with each other, also made the following new false misrepresentations:

A.      that Enis was going to find a buyer to purchase The Lakes and pay off the BankFirst Loan;

B.      that Enis was going to repay the $2,300,000 plus interest to Ginsburg; and

C.     that Barna had agreed to the extension of the BankFirst Loan.

463.    Strategica, SWP, Enis and Burstein, in concert with each other, committed material omissions by failing to inform Ginsburg:

A.     that the BankFirst Loan had a one year term, had matured, and that they needed the funds to cover the interest on the extended loan; and

B.     that the Beher Mezz Loan was being taken out to pay off the MJ Mezz Loan. They did not disclose, explain or discuss the Beher Mezz Loan with Ginsburg.

464.    To convince Nationwide and Ginsburg to sign the Consulting Agreement and Shareholders Agreement. Strategica, Enis and Burstein, falsely represented that they would fund the $4,000,000 payment to Pachter memorialized in the Satisfaction Agreement.

465.    Strategica, Enis and Burstein, falsely represented that they would provide "intellectual capital" to Nationwide and provide approximately $40,000,000 in value to Nationwide.

466.    Strategica, Enis and Burstein made the aforesaid negligent misrepresentations and/or omissions, knowingly and willfully, and fully intending that Plaintiffs would rely upon the same.

467.    Ginsburg executed the BankFirst Guaranty, MJ Mezz Loan Guaranty, Beher Mezz Loan Guaranty, the Consulting Agreement, and Shareholders Agreement, in justifiable reliance upon the negligent misrepresentations and/or false statements of Strategica, SWP, Enis and Burstein.

468.    Nationwide executed the Consulting Agreement and Shareholders Agreement in justifiable reliance upon the negligent misrepresentations and/or false statements of Strategica, Enis and Burstein.

469.    At the time of aforesaid representations, Strategica, SWP, Enis and Burstein knew or should have known that the same were false and/or that they were failing to disclose material facts. Moreover, Strategica, SWP, Enis and Burstein knew or should have known that they were not capable of performing as represented, and/or had no intention of performing as represented.

470.    As a direct and proximate result of the aforesaid, Ginsburg and Nationwide have suffered damages substantially in excess of $75,000.00.

WHEREFORE, Plaintiffs, Ginsburg and Nationwide, hereby demand judgment against the Defendants, Enis, Burstein, Strategica and SWP, for compensatory damages substantially in excess of $75,000.00, together with awarding Ginsburg his costs and disbursements; pre-judgment interest, and such other and further relief as this Court deems just, equitable and proper.

## COUNT XIX – UNJUST ENRICHMENT v. ALL DEFENDANTS

471.    Ginsburg repeats and realleges each and every allegation contained in Paragraphs 1 through 234 above as if set forth herein in full. Nationwide repeats and realleges each and every allegation contained in Paragraphs 1 through 28 and 154 through 234 above as if set forth herein in full.

472.    This is an action for unjust enrichment seeking damages sustained by

Plaintiffs, Ginsburg and Nationwide, substantially in excess of $75,000.00.

473.    Relying on Ginsburg's credit, SWP, Strategica, Enis and Burstein received substantial funds at closing of the BankFirst loan even though they had nothing at risk in the loan.

474.    Enis fraudulently convinced Ginsburg to provide him, Strategica and SWP with $2,300,000, plus interest that was owed to Ginsburg. This has not been repaid.

475.    Despite providing no services of value to Nationwide, Strategica was paid $60,000 per month.

476.    In exchange for nothing of value, 50% of the stock of Nationwide was issued to Enis and Burstein's straw persons/ designees, Cook, Kranz, Gilda Burstein and Susan Enis.

477.    Glikman and Shiboleth were paid attorneys' fees by Nationwide notwithstanding the fact that they had an unwaivable conflict of interest.

478.    Lieber, the Ritter Firm and Royal Title failed to account for Ginsburg's funds, failed to deposit the funds into an interest bearing account, and were paid attorneys' fees while simultaneously failing to adequately represent Ginsburg, and having a conflict of interest.

479.    Defendants have been unjustly enriched and it would be inequitable for Defendants to have accepted these benefits and not repaid Ginsburg and Nationwide.

WHEREFORE, Plaintiffs, Ginsburg and Nationwide, hereby demand judgment against the Defendants, Defendants, Enis, Burstein, Strategica, SWP, Lieber, the Ritter

Firm, Royal Title, Glikman, Shiboleth, Cook, Kranz, Susan Enis and Gilda Burstein, for compensatory damages substantially in excess of $75,000.00, together with awarding Ginsburg his costs and disbursements, pre-judgment interest, and such other and further relief as this Court deems just, equitable and proper.

## COUNT XX – CONSTRUCTIVE TRUST v. ENIS, STRATEGICA, SWP, COOK, KRANZ, GILDA BURSTE IN AND SUSAN ENIS

480.   Ginsburg repeats and realleges each and every allegation contained in Paragraphs 1 through 234 above as if set forth herein in full. Nationwide repeats and realleges each and every allegation contained in Paragraphs 1 through 28 and 154 through 234 above as if set forth herein in full.

481.   This is an action by Plaintiffs, Ginsburg and Nationwide, to impose a constructive trust on property held in the name of Enis, Strategica, SWP, Cook, Kranz, Gilda Burstein and Susan Enis.

482.   As a result of Defendants' wrongful conduct outlined hereinabove, Defendants, Enis, Strategica, SWP, Cook, Kranz, Gilda Burstein and Susan Enis, have obtained substantial funds and property of Ginsburg and Nationwide, the disposition and use of which funds and property were not appropriately authorized, and/or were received for an inadequate consideration.

483.   Enis, Strategica and SWP were joint venturers with Ginsburg and held a confidential or fiduciary relationship of the utmost loyalty and good faith to Ginsburg.

484.   Defendants acquired assets and property of Ginsburg and Nationwide

through fraud and in violation of Strategica's, Enis' SWP's and Burstein's confidential and fiduciary relationships with Ginsburg, and by virtue of the improper conduct described throughout.

485.    In equity and good conscience, Defendants should not be entitled to retain the advantage which they have obtained by wrongfully receiving the assets and property of Ginsburg.

486.    Plaintiffs have no adequate remedy at law.

WHEREFORE, Plaintiffs, Ginsburg and Nationwide, hereby demand judgment against the Defendants, Enis, Strategica, SWP, Cook, Kranz, Gilda Burstein and Susan Enis, and request that the Court impose a constructive trust on all property, funds, stock (including but not limited to 50% of the shares of Nationwide) and assets that Defendants obtained from Ginsburg and/or Nationwide, together with awarding Ginsburg his costs and disbursements, pre-judgment interest, and such other and further relief as this Court deems just, equitable and proper.

## COUNT XXI –TURNOVER OF PROPERTY TO THE BANKRUPTCY ESTATE AND FOR AN ACCOUNTING – GINSBURG v. STRATEGICA, ENIS, BURSTEIN, COOK, KRANZ, GILDA BURSTEIN AND SUSAN ENIS

487.    Ginsburg repeats and realleges each and every allegation contained in Paragraphs 1 through 234 above, as if set forth herein in full.

488.    To the extent the Court grants the relief demanded in Counts XII and XX above, this action seeks the turnover of property of the Debtor's bankruptcy estate pursuant to Section 542 of the Bankruptcy Code, as well as an accounting in connection

therewith.

489.    Through fraud and false pretenses, Defendants acquired assets of Ginsburg, which assets constitute property of the bankruptcy estate pursuant to Section 541 of the Bankruptcy Code.

490.    Ginsburg is entitled to the immediate turnover of all such property and to an accounting in regard to such property.

WHEREFORE, Ginsburg demands the entry of judgment against Strategica, Enis, Burstein, SWP, Cook, Kranz, Gilda Burstein and Susan Enis: (i) ordering them to turn over all funds, property, assets and other things of value misappropriated from Ginsburg; (ii) ordering Strategica, Enis, Burstein, SWP, Cook, Kranz, Gilda Burstein and Susan Enis to account regarding the status, use and current location of such funds, property and assets; and (iii) for such other relief the Court may deem appropriate.

**COUNT XXII – FRAUDULENT TRANSFER PURSUANT TO FLORIDA STATUTES §§ 726.105 AND/OR 726.106 – GINSBURG v. STRATEGICA, ENIS, BURSTEIN, COOK, KRANZ, GILDA BURSTEIN AND SUSAN ENIS**

491.    Ginsburg repeats and realleges each and every allegation contained in Paragraphs 1 through 234 above, as if set forth herein in full.

492.    This is an action for avoidance of fraudulent transfers of property of this Estate pursuant to Florida Statutes §§ 726.105 and/or 726.106 as made applicable by 11 U.S.C. §544(b).

493.    Ginsburg's interest in Nationwide constitutes property of this Estate which was as set forth herein transferred to Defendants, Strategica, Enis, Burstein, Cook, Kranz,

Gilda Burstein and /or Susan Enis.

494.    Ginsburg also acted as agent of Ricki and her stock in Nationwide was, as the result of the conduct of the Defendants described in paragraph 474 above, also fraudulently transferred to said Defendants.

495.    The transfers of the stock of Ginsburg individually and on behalf of Ricki constitutes a transfer within the meaning of Florida Statutes §§726.105 and 726.106.

496.    Said transfers were made by Ginsburg without receiving a reasonably equivalent value in exchange for the transfer or obligation.

497.    At the time of the transfers Ginsburg was engaged or about to be engaged in a business or transaction for which his remaining assets were or became unreasonably small in relation to the business or transaction or alternatively, incurred debts beyond his ability to pay as they came due.

498.    Alternatively, Ginsburg became insolvent as a result of the above transfers and/or obligations.

WHEREFORE, Ginsburg demands judgment avoiding the transfers of his and Ricki's stock in Nationwide pursuant to Florida Statute §726.105(1)(b) and/or Florida Statute §726.106 and for such further relief as may be just and proper under the circumstances.

### COUNT XXIII – INJUNCTION, BREACH OF NON-COMPETE AND CONFIDENTIALITY CLAUSES OF CONSULTING AGREEMENT – NATIONWIDE vs. STRATEGICA, ENIS AND BURSTEIN

499.    Nationwide repeats and realleges each and every allegation contained in

Paragraphs 1 through 28 and 154 through 234 above, as if set forth herein in full.

500.    This is an action by Nationwide for temporary and permanent injunctive relief to prevent Strategica, Enis and Burstein from utilizing Nationwide's proprietary and confidential information for their own purposes, from stealing customers from Nationwide and from competing with Nationwide.

501.    Section 7 of the Consulting Agreement prohibits Strategica from disclosing or utilizing Nationwide's proprietary and confidential information for any purpose other than providing services to Nationwide.

502.    Section 8 of the Consulting Agreement prohibits Strategica, Enis and Burstein from competing with Nationwide, "as a stockholder, member, partner, officer, lender, consultant or agent" "in any other business involving the operation of medical laboratory testing facilities" "or to solicit and officer or employee then employed" by Nationwide to work in such competing business.

503.    Strategica, Enis and Burstein have beached Section 7 of the Consulting Agreement by utilizing Nationwide's proprietary and confidential information, including its customer/patient lists for their own business purposes.

504.    Strategica, Enis and Burstein have beached Section 8 of the Consulting Agreement by:

A.    setting up businesses that provide medical laboratory testing; and

B.    stealing customers and patients from Nationwide and directing them to their other businesses, including their home healthcare business

505.    Strategica, Enis, and Burstein have continued to:

A.    utilize Nationwide's proprietary and confidential information;

B.    operate competing businesses; and

C.    steal business from Nationwide.

506.    This action has caused damage to Nationwide.

507.    Nationwide will suffer irreparable injury, if this Court does not act to compel Strategica, Enis and Burstein to comply with Paragraphs 7 and 8 of the Consulting Agreements.

508.    There is a substantial likelihood that Nationwide will prevail on the merits herein.

509.    Nationwide lacks an adequate remedy at law.

510.    Nationwide will suffer irreparable harm and lack an adequate remedy at law because money damages are not available as a sufficient remedy for Strategica, Enis and Burstein's conduct, and it is impossible to quantify the injury suffered by Ginsburg and Nationwide and the loss of potential business attributable to Defendants' actions.

511.    The irreparable injury to Nationwide in the event that injunctive relief does not issue substantially outweighs any possible harm to Strategica, Enis and Burstein.

512.    The grant of an injunction will serve the public interest.

WHEREFORE, Plaintiff, Nationwide, respectfully requests that this Court enter a preliminary and thereafter permanent injunction, requiring the Defendants, Strategica, Enis and Burstein, to comply with Sections 7 and 8 of the Consulting Agreement, and

refrain from utilizing Nationwide's proprietary and confidential information for any purpose; cease operating business that compete with Nationwide; cease soliciting and/or contacting the customers/patients of Nationwide; cease soliciting and/or contacting the employees of Nationwide; together with awarding Nationwide damages as incidental relief, its costs and disbursements, pre-judgment interest, and such other and further relief as this Court deems just, equitable and proper.

I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090-1(A).

Dated this 12th day of February, 2010.

RICE PUGATCH ROBINSON & SCHILLER, P.A.
101 Northeast Third Avenue, Suite 1800
Fort Lauderdale, Florida 33301
Telephone: (954) 462-8000
Facsimile: (954) 462-4300

By: /s/ Chad Pugatch
      CHAD P. PUGATCH
      Florida Bar Number: 220582
      cpugatch@rprslaw.com

*and*

MOSKOWITZ, MANDELL, SALIM & SIMOWITZ, P.A.
Michael W. Moskowitz, Esq.
Attorneys for Plaintiff, Mark J. Ginsburg
800 Corporate Drive, Suite 500
Fort Lauderdale, FL 33334
Telephone: (954) 491-2000
Facsimile: (954) 491-2051

WEISS SEROTA HELFMAN
PASTORIZA COLE & BONISKE, P.L.
Attorneys for Nationwide Laboratory Services, Inc.
2525 Ponce de Leon Boulevard
Suite 700
Coral Gables, Florida 33134
Telephone:   (305) 854-0800
Facsimile:   (305) 854-2323

By: _____
    JOSEPH H. SEROTA
    Florida Bar No. 259111
    jserota@wsh-law.com
    JOHN J. QUICK
    Florida Bar No. 648418
    jquick@wsh-law.com